## I. W. Prichard v. Charles W. Moore.

1. VERDICTS—*Against the Weight of the Evidence.*—In a suit against a doctor for malpractice the court discusses the evidence and concludes that the case is not such a one as that a verdict either way must be supported, but that the evidence preponderates for defendant to such an extent that the verdict and judgment should be set aside and a new trial awarded.

2. INSTRUCTIONS—*For Plaintiff—Adaptation of, to Defendant's Theory of Case.*—The court holds in this case that it was not necessary for the plaintiff to adapt all his instructions to a defense not appearing from his evidence, but that it was for the defendant to offer instructions based upon his theory of the facts.

**Trespass on the Case,** for malpractice. Appeal from the Circuit Court of Kane County; the Hon. HENRY B. WILLIS, Judge, presiding. Heard in this court at the December term, 1897. Reversed and remanded. Opinion filed May 23, 1898.

C. I. McNETT, and HOPKINS, THATCHER & DOLPH, attorneys for appellant.

ALDRICH, WINSLOW & WORCESTER, attorneys for appellee.

MR. JUSTICE DIBELL DELIVERED THE OPINION OF THE COURT.

On January 14, 1896, while appellee was skating, the ice broke under him, and in his fall and struggles to get out of the water his right shoulder was injured. He returned to his room in a hotel in Aurora, and appellant, a physician and surgeon, was called. Appellant attended and treated appellee until January 22d, and thereafter ceased his visits. Appellee remained without further surgical and medical attendance till February 6th, when he talked with Dr. Smith. On February 8th, Drs. Smith and Windett made an examination of the shoulder, and on February 12th they performed an operation upon it. Dr. Smith thereafter treated appellee till he was healed. Since then he has only a partial use of the arm and shoulder. In January, 1897, appellee brought this suit against appellant for malpractice, and there was a trial upon issues joined, resulting in a judgment for plaintiff, from which defendant below prosecutes this appeal. The main contested questions of fact are, first, whether Dr. Pritchard gave defendant proper and skillful treatment, and second, whether on January 22d he discharged his patient as cured, when in fact the latter needed further treatment, as plaintiff claims, or whether the plaintiff threw off all restraint, refused to obey all orders of his physician, refused to submit to a necessary examination, and in effect discharged the doctor, as defendant claims.

The persons present at the doctor's first visit, when he was operating upon the arm and shoulder, were friends of the plaintiff, a bar tender, the manager and the former manager of the hotel, and a man whose only employment was sitting around the hotel. They testified that the doctor, upon examining his patient, said the shoulder was dislocated, and did certain things to restore the head of the bone of the arm to its proper place, and then announced that it

was in place. He then told them he heard a grating sound, indicating fracture. He then did up the arm, put it in a sling, gave directions for hot applications upon the shoulder and went away. They were not skilled in such cases and did not undertake to testify whether or not the doctor made a correct diagnosis and took proper and skillful measures. Plaintiff chiefly made his case by proving by these witnesses and by others present at later visits what they saw the doctor do, and what they did not see him do, and by proving by medical men what the proper treatment would have been. But this evidence as to what the doctor did and omitted was necessarily of slight weight, when not in harmony with that of the physician. These men did not know what the doctor ought to do. They were not spying upon him to see what he did do. They evidently had no thought then that there was any lack of proper skill and care. He might easily have done many things they did not notice and have observed symptoms which their untrained eyes did not recognize. Dr. Pritchard testified that while with the aid of bystanders he was trying to restore the bone to its place, he kept his right hand under the arm pit, felt the head of the bone there (the dislocation being downward), and as he pressed the bone into place he could no longer feel it at the arm pit; and that the depression on the outer surface of the shoulder (which had indicated dislocation) disappeared; and by the sound which he heard of the bone slipping into place, by the feeling at the arm pit, and by the disappearance of the depression on the outside of the shoulder, he knew the bone was in its proper place. None of plaintiff's friends testified anything about the doctor having his hand in the arm pit. It was not strange they did not recall that, for if they saw it they would not know why it was placed there. Some of plaintiff's witnesses did not hear the sound of the bone slipping into its socket, but one of them did, and after his corroboration of the doctor the failure of the others to notice it is no proof it did not occur. None of them had the knowledge which would give significance to the appearance and disappearance of the

depression on the outside of the shoulder. The doctor testified that at the first visit he ascertained there was a fracture, but the shoulder was so badly swollen he could not locate it, and he deferred locating it till he could reduce the swelling, and that he omitted the usual appliance of a shoulder cap in order to place hot applications on the shoulder to reduce the inflammation; but that he took certain measures, which he described in detail, to ascertain that if there was a fracture of the bone of the arm, the broken parts were in apposition. Some of plaintiff's friends claimed the arm was not then swollen, but one of them testified it had commenced to swell, or plaintiff had an extra large arm. Another witness of plaintiff, who first came there the next day, testified he was then told by the doctor that there was a possibility of a fracture, but it could not then be located or its extent ascertained because plaintiff's arm was badly swollen. Dr. Prichard testified that that first night he fastened plaintiff's arm to his side. Plaintiff and some of his witnesses testified this was not done till next day; but one of plaintiff's witnesses testified that at the first visit there was a bandage put on " that held the arm to his side so as not to have him move it more than possible." Dr. Prichard called Dr. Norton in consultation. Plaintiff and some of his witnesses claimed Dr. Norton was there but once, but both Drs. Prichard and Norton testified Dr. Norton was there with Dr. Prichard on three different days, and Dr. Norton gave the dates of each of his visits and described the condition of his patient each time. Plaintiff testified the length of his arm was not measured at all. Dr. Prichard testified that at the first and nearly every succeeding visit (of which he made two nearly every day), he measured the length of the injured arm and compared it with the length of the sound arm. Dr. Norton testified he measured both arms and compared their lengths the first time he was there.

Dr. Prichard had been a practicing physician and surgeon about thirty years. His evidence shows he knew the proper treatment of a patient in the condition he found plaintiff.

He detailed the condition of the patient on that and the succeeding days to January 22d, and the various steps he took and applications he made. The doctors who testified for plaintiff agreed that if plaintiff's shoulder was swollen when Dr. Prichard reach him, as Dr. Prichard described, and if he treated the arm as he testified, then the treatment he administered and the course he pursued was proper, and was the exercise of the ordinary care of an ordinary physician in good practice. We think the evidence of the unskilled witnesses who failed to see some things which Dr. Prichard testifies he saw and did, and who failed to notice some symptoms and conditions patent to the trained eye of the physician and who disagreed with each other in several respects as to what did take place, was not sufficient to show that Dr. Prichard failed to pursue the treatment skill required of him.

Plaintiff testified Dr. Prichard closed his attendance by telling him he did not think he needed to come any more, but when plaintiff got out of bed, in a few days, to come to the doctor's office and the doctor would work the arm back and forth so it would not be stiff. At the time the doctor said this, plaintiff testified he told the doctor his arm was very painful; and that his sister was present and Dr. Norton was not. Plaintiff's sister corroborated him, except that she did not say whether this was the doctor's last visit. On the contrary Dr. Prichard testified he and Dr. Norton visited plaintiff on January 22d and found him alone; that plaintiff was sitting on the edge of the bed dressing; that the bandage binding his arm to his side was off and the sling was gone and his arm was hanging loose by his side; that the doctor expostulated with him and told him there was a fracture and it was necessary to keep the arm bound up; that plaintiff replied he had had the bandages on long enough, and that he did not think there was any fracture and did not want the arm examined any further, and that if he wanted the doctor he would call at his office. Dr. Prichard testified he told plaintiff he had brought chloroform and intended to give it to him so they might make

another examination and locate the fracture; and plaintiff refused to take the chloroform and refused to permit a further examination. The doctors then went away, and Dr. Prichard had no further connection with the case. Dr. Norton described the interview in similar terms. O'Neil, a witness for plaintiff, testified that from ten to fourteen days after the injury, which would be from two to six days after Dr. Prichard's last visit, plaintiff told him the doctor had not done the square thing and he had " fired " him, and that he had had all he wanted of him. Dr. Norton testified that long afterward, having heard plaintiff was going to make trouble for Dr. Prichard, he asked plaintiff if he blamed Dr. Prichard for the condition of his arm, and plaintiff replied he did not.

The probabilities supported the testimony of Drs. Prichard and Norton. Plaintiff was a blacksmith, a strong active man, accustomed to the use of liquor. He had been kept in bed eight days with his arm bound to his side. It was natural he should become impatient. Unless Drs. Prichard and Norton are rank perjurers they had been watching the gradual reduction of the swelling for the purpose of making an examination and locating the fracture, as soon as the swelling had sufficiently subsided to permit it. They were there that day with anaesthetics for that express purpose, having at their last preceding joint visit decided the swelling was likely to be sufficiently subsided by that time. It is not easy to believe that under such circumstances and without making any examination of the arm, and with the patient complaining the pain was very great, Dr. Prichard declared further attendance unnecessary and withdrew from the case. The attendance of a consulting physician three times shows the case was regarded as serious. We think the only reasonable conclusion to be drawn from the evidence in this record is that Dr. Prichard treated the patient with proper skill and care, and that plaintiff became impatient of the necessary and tedious restraint, removed the necessary appliances the doctor had placed upon him, refused to permit further examination and to receive further

treatment, and virtually discharged the doctor, and thereby exonerated him from further responsibility.

When Drs. Smith and Windett opened the shoulder on February 12th, twenty-one days later, they found an oblique fracture of the surgical neck of the humerus, and found the upper extremity of the bone in the arm pit nearly at right angles to the shaft of the arm and bound down by adhesions. They decided the head of the bone was so firmly adhered that it could not be restored to its proper place without making a worse arm. They therefore removed the fractured head of the humerus, rounded the end of the broken shaft, placed it in the socket and made a false joint. If the evidence had shown the adhesions could not have been formed in three weeks, that would have tended strongly to show Dr. Prichard was mistaken in testifying (as he did) that he kept the dislocation reduced and the broken parts in apposition, and the arm of the same length as the other, all the time he treated it. But Dr. Smith testified it was not possible to tell how long the broken head of the bone had been in the arm pit; and Dr. Windett testified there was nothing in what he found there to indicate but what the joint might have got out of place after Dr. Prichard quit treating it. They both testified they found a large rupture of the ligaments which aid in holding the head of the humerus in place, and that because the rupture was so large the joint once put back would easily get out of place again, and that if there was also a fracture a slight movement would again produce dislocation. There was therefore nothing in the disclosures made by the operation performed by Drs. Smith and Windett which show Dr. Prichard did not treat his patient with proper skill. It is a fair inference from the evidence that the patient, by removing the bands and restraints, leaving his bed and permitting his arm to hang free, and going about thereafter, caused the head of the bone to again become dislocated and thereby separated the broken parts which Dr. Prichard had endeavored to keep in apposition till the swelling was reduced. We do not think this was a case where a

verdict either way must be supported, but that the evidence preponderates for defendant to such an extent that a new trial should be awardeded.

It was not error for plaintiff while on the witness stand to show to the jury to what extent he could move his arm. That demonstration simply made more plain to the jury that which is usually described in words. Defendant had an opportunity to cross-examine him on the subject. The other rulings on the evidence do not seem open to serious criticism when the entire evidence is considered.

The second instruction given at the request of the plaintiff required defendant to " use the appliances and instrumentalities ordinarily used by surgeons of good standing and reasonable and ordinary skill." It is urged this was error; that defendant had the right to employ anya ppliances, whether ordinarily used or not, if he exercised reasonable and ordinary skill; and that this instruction would exclude new and better appliances than those in ordinary use. But there was no claim unusual appliances had been employed. The doctor claimed he used certain appliances which all the medical witnesses testified were the ordinary appliances, but plaintiff claimed the doctor did not use them. The instruction, therefore, was not erroneous in the condition of the proof, though it might have been if the proof had shown defendant employed unusual appliances. Several instructions given at the request of plaintiff, did not make the exercise of due care and obedience by the plaintiff a prerequisite to his right of action. It was not necessary plaintiff should adapt all his instructions to a defense not appearing from his evidence. It was for defendant to offer instructions based upon his theory of the facts. The effect of lack of care by plaintiff and refusal to obey the physician was fully stated in instructions given at the request of defendant.

The judgment of the court below will be reversed and the cause remanded for a new trial.