JEAN ANN LONGMAN, Plaintiff-Appellee, v. CLEMENT JASIEK, Defendant-Appellant.

Third District    No. 80-94

Opinion filed December 19, 1980.

84

James S. Mills and Gates W. Clancy, both of Geneva, for appellant.

David V. Dorris, of Jerome Mirza & Associates, Ltd., of Bloomington, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The plaintiff in this case, Jean Ann Longman, sued the defendant, Dr. Clement Jasiek, a dentist specializing in oral surgery. The case came to trial in the Circuit Court of La Salle County, resulting in a verdict and judgment for the plaintiff in the amount of $35,000. A post-trial motion and a motion to reduce judgment were denied by the presiding judge below, and this appeal followed.

In late 1975, Jean Ann Longman was 23 years old, in good health, and recently graduated from Illinois State University in Normal with a degree in political science. Upon the advice of her family dentist, Dr. Harold Hutchinson, Jean made an appointment to have four wisdom teeth

removed by the defendant in this cause, Dr. Jasiek. On December 17, 1975, Jean went from her home in Henry, Illinois, to the office of Dr. Jasiek in La Salle, where all four of her wisdom teeth were removed, two of which required a surgical procedure followed by suturing of the gum and skin where the removal had taken place.

Jean returned on December 23 for the purpose of having the sutures removed and for the defendant to be able to see the areas of the operation. She had experienced no unexpected discomfort during the interim, and the sutures were removed uneventfully.

On the next day, December 24, in the evening, Jean developed pain and stiffness and swelling in her right jaw which continued through that evening and on into the next day, Christmas. On the morning of the 26th, with the condition still persisting, Jean called Dr. Jasiek's office to report her condition and to seek his care and assistance. At this point her jaw was very stiff and she could barely move it at all. She spoke to the doctor's nurse and explained the problem she was having. The doctor's nurse asked if she was having pain in the area of the extraction itself. Jean replied "no" and the nurse, with Dr. Jasiek's approval, advised Jean that since she wasn't having any pain in the area of the extraction then her problems were not related to the oral surgery. She was told to see a medical doctor.

Later that day Jean went to see her family doctor in Henry. The general practitioner, Dr. Anton F. Tochalauski, examined Jean and suggested that she see her oral surgeon, who, the family doctor felt, would be better qualified to treat the problem. Jean explained that the oral surgeon's office had refused her treatment and referred her instead to her family doctor. Under those circumstances, Dr. Tochalauski gave Jean an injection of a steroid-type medicine and prescribed a modest dosage of penicillin in oral form. As a result of this medication Jean experienced some immediate relief of her pain and swelling, but by the 29th of December the pain was back and even more intense. Moreover, the swelling persisted and she could barely move her mouth.

Jean again called the oral surgeon's office and related her symptoms, to-wit, pain and swelling in her jaw. Again she was told to see her family doctor. Jean followed the telephoned instructions from the oral surgeon's office and visited Dr. Tochalauski. The family practitioner again recommended that Jean see the oral surgeon who had extracted her teeth, but after hearing Jean relate his telephonic refusal to assist, the December 26 treatments were repeated.

The steroid penicillin combination brought immediate but short-lived relief. On January 5, 1976, Jean was returning to her family doctor who, for the first time in his examination, noted evidence of infection. On this, the third visit, Dr. Tochalauski had the plaintiff admitted to St.

Francis Hospital in Peoria. She was exhibiting symptoms of swelling of the right cheek, headaches, temperature, restricted jaw movement, and drainage from the right side of the mouth. Jean was treated with a high dosage of intravenous penicillin for eight days followed by reduced dosages of oral penicillin. Sixteen days later, on January 21, Jean was discharged from the hospital with a continuing prescription for oral penicillin.

Less than two weeks later, on February 2, 1976, Jean was rehospitalized with a temperature, facial swelling on the right side, and a continuing abscess at the site of her tooth extraction. During this hospital stay, which extended for a period of four weeks, an infection of the jaw bone known as osteomyelitis was diagnosed. Jean was placed on an even higher dosage of intravenous penicillin. By March 11, Jean's pain and swelling had subsided and the doctors felt that the infection and osteomyelitis were under control. She was discharged from the hospital with a continuing prescription for oral penicillin. Since leaving the hospital, Jean has continued to improve.

Based on the preceding sequence of events, Jean brought suit against Dr. Jasiek alleging that as a result of abandonment of and refusal to treat the plaintiff, an abscess developed in the right part of her jaw which eventually reached the bone and developed into osteomyelitis. The verdict reached in the proceeding below attests to the fact that the jury agreed with the allegations in the complaint. Dr. Jasiek prosecuted this appeal.

The defendant doctor urges us to find that the verdict reached below was against the manifest weight of the evidence and that the alleged act of malpractice, specifically, abandonment of the patient, was not established as a matter of law under prevailing precedent. The facts previously set forth in this opinion were all excerpted from the record of the trial below and represented evidence properly admitted for the jury's consideration. In addition, the defendant himself made certain damaging admissions under questioning by plaintiff's counsel pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Among other responses to section 60 inquiries, the defendant admitted that it was likely that plaintiff's condition could have been taken care of if treated by an oral surgeon, that swelling near the area of extraction was a symptom of abscess developing, and that in some cases the only effective treatment for an abscess is to open it up. After these statements, the following exchange took place between plaintiff's counsel and the defendant:

> "Counsel: Certainly any patient that develops swelling near the site of extractions in the jaw area seven days or more after the extractions you would want to see them on a follow-up basis, wouldn't you?

Defendant: Unless it's another problem.

Counsel: You couldn't tell if it was another problem unless you saw the patient?

Defendant: That's right. * * *"

Thus, by the defendant's own testimony, it would appear that based on the phone conversations between the plaintiff and the defendant's agent, the defendant should have suspected that an abscess was developing. The defendant knew that some abscesses can only be treated by draining. Finally, defendant concedes that it is likely that someone with his professional background could have successfully treated the plaintiff.

Even if it is established that the defendant could have treated the plaintiff so as to prevent the progression of her abscess into a serious condition of osteomyelitis, we are urged to find that there is no duty on the part of the oral surgeon beyond that of removing plaintiff's teeth with the same degree of knowledge, skill and care which a good professional would bring to a similar case under like circumstances. Dr. Bruno Kwapis, an expert in the field of oral surgery, testified to the contrary on behalf of the plaintiff.

"* * * A surgeon, whatever area of the anatomy he works on, has a responsibility of not only the intra-operative skills and procedures he performs, but in addition to the postoperative management of the case to include complications that may take place. Based on the information that was given me on this hypothetical situation it would appear to me that the oral surgeon did not follow up on the management of his case and deferred it to someone else."

According to Dr. Kwapis, the surgeon's duty extends beyond the time when the scalpel is laid to rest and the wound is sutured. According to Dr. Kwapis, the surgeon's duty extends through at least some period of postoperative supervision. And, according to Dr. Kwapis, based on a set of hypothetical facts which are identical to the actual testimony heard in the case at bar, the defendant surgeon's duties had not ceased to Jean Ann Longman when treatment was refused on December 26 and December 29.

Abraham Lincoln participated as counsel in an early medical malpractice case decided by the Illinois courts and cited to us by the defendant. Therein it was held that "when a person assumes the profession of physician and surgeon, he must, in its exercise, be held to employ a reasonable amount of care and skill." (*Ritchey v. West* (1860), 23 Ill. 329, 330.) That amount of reasonable care which the physician and surgeon must employ is not the highest order to which some men attain, but rather that which is ordinarily possessed by members of the profession. (*Ritchey v. West*.) Clearly, one who qualifies as an expert in the area of oral surgery is permitted to testify as to the degree of care which is ordinarily

exercised by members of his profession. And, in the case *sub judice*, an expert in the defendant's professional field testified that the care ordinarily rendered by an oral surgeon and the duty an oral surgeon owes his patient extends through a certain postoperative period.

■■ In another early case, the Illinois court implicitly recognized that when the physician discharged his patient as cured when in fact the latter needed further treatment, a duty was breached giving rise to a cause of action in malpractice. (*Prichard v. Moore* (1898), 75 Ill. App. 553.) Although in *Prichard* the court found that the evidence was insufficient as a matter of law to support the claim, the cause of action pleaded in the complaint was not dismissed. The surgeon's duty to continue treating his patient is not established within the absolute discretion of the surgeon himself, but rather is subject to the standards of the profession as suggested by the *Ritchey* case. (*Church v. Adler* (1953), 350 Ill. App. 471, 113 N.E.2d 327.) Illinois is not alone in requiring surgeons generally and in requiring oral surgeons specifically to continue caring for the patient until the threat of postoperative complications is past. (See Annots., 57 A.L.R.2d 432 (1958); 83 A.L.R.2d 7, §21(a) (1962).) Illinois has implicitly agreed with the authorities in both of the cited annotations. (*Prichard v. Moore*; *Church v. Adler*.) Where injury results from the surgeon's refusal to continue treatment through postoperative complications as would another professional exercising ordinary skill and care, a cognizable claim arises. We believe the evidence supports the jury's verdict that the defendant's conduct in abandoning and refusing to treat the plaintiff during postoperative complications was wrongful.

■■ We also believe that the evidence in the record, particularly defendant's own admissions, tends to show that Dr. Jasiek's wrongful act proximately caused plaintiff's abscess to develop into osteomyelitis. It is true that the expert evidence at trial tends to show that Dr. Tochalauski's treatment with steroids and penicillin was not medically preferred. Nevertheless, defendant admits that if he had seen Jean Ann Longman, he probably could have treated her abscess effectively. The defendant's admissions may provide the basis for plaintiff's prima facie case. (*Plost v. Louis A. Weiss Memorial Hospital* (1978), 62 Ill. App. 3d 253, 378 N.E.2d 1176.) Even though Dr. Tochalauski's treatment may have been improper and counterproductive under the circumstances, it is not necessarily a superseding cause which will insulate the defendant from liability for his wrongful act. *Stewart v. DuPlessis* (1963), 42 Ill. App. 2d 192, 191 N.E.2d 622; *Sundin v. Hughes* (1969), 107 Ill. App. 2d 195, 246 N.E.2d 100.

■■ The defendant oral surgeon suggests that he should be judged by some reduced standard of care during the period of time he refused to treat the plaintiff. Apparently, during the period Dr. Jasiek suffered a vision impairment as a result of foreign particles trapped in his eye. While

no authority is cited, we believe the jury was justified in refusing to modify the standard of care in light of the evidence that Dr. Jasiek continued to examine and treat other patients on the very days when plaintiff's telephoned pleas were spurned.

At another point in his brief, the defendant urges us that the plaintiff failed to prove freedom from contributory negligence in the trial below. Specifically, Dr. Jasiek alleges that the plaintiff failed to rinse her mouth as directed and failed to keep a scheduled appointment on December 31. Jean Ann Longman's testimony disputes both of these contentions. First, her testimony is that she followed all the instructions which she received from Dr. Jasiek, including the recommendations for oral rinsing. Second, her testimony is that no one in the defendant's office ever gave her an appointment to see Dr. Jasiek after her stitches were removed. Credibility of witnesses where there is a dispute in the evidence is a question for the jury, and it is for them to determine the weight to give to the statements of each of the witnesses. (*Diversey Liquidating Corp. v. Neunkirchen* (1939), 370 Ill. 523, 19 N.E.2d 363.) Since there is support in the record for the jury's determination that the plaintiff was free of contributory negligence, we find that this allegation of error is without merit.

Finally, defendant suggests that the trial court erred in not reducing the judgment pursuant to section 68.4 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 68.4). Section 68.4, a relatively new statute, reads as follows:

> "An amount equal to 50% of the benefits provided for medical charges, hospital charges, lost wages, private or governmental disability income programs, or nursing or caretaking charges, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence or other wrongful act, not including intentional torts, on the part of a licensed hospital or physician; provided, however, that:
>
> (1) Application is made within 30 days to reduce the judgment;
>
> (2) Such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise; and
>
> (3) The reduction shall not reduce the judgment by more than 50% of the total amount of the judgment entered on the verdict."

Section 68.4 is a part of Public Act 79-1434 which was introduced in the Illinois 79th General Assembly as House Bill 3957 by Representative Harold Washington. The Bill represented an attempt to curb the rising costs of medical malpractice insurance premiums, and the sponsor took

several approaches all aimed at the same end. In describing the purpose of section 68.4, Representative Washington explained:

> "* * * we felt that we should in a sense adjust the tort system of this State to the point where it would remove the frivolous suits, remove the embarrassment and some abuses which have taken place in that field and at the same time, give adequate and strong and consistent protection to those who have been injured through medical negligence on someone's part." (Transcript of Proceeding, Illinois House of Representatives, June 11, 1976.)

The adjustment to the tort system accomplished by section 68.4 is to modify the common law rule as to collateral sources. Whether a special law of this type could ever be constitutionally applied is an issue not before us today (see, *e.g.*, *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 347 N.E.2d 736), because it is clear from the plain language of the statute that it cannot apply in the case before us.

The plaintiff's parents, Leonard and Gertrude Longman, issued 14 checks drawn on their bank account in payment of their daughter's medical expenses. Defendant argues that this payment on Jean's behalf from a collateral source is subject to reduction pursuant to section 68.4. The circuit court determined that the payments by Jean's parents were "loans" and thus subject to recoupment making the reduction of section 68.4 inapplicable. The defendant urges us to hold that the circuit court incorrectly determined that the payments were "loans" instead of "gifts." We believe that the reduction required by section 68.4 would not apply in either case.

■■ As the trial court correctly determined, if the payment by Jean's parents was a loan, it is subject to recoupment and thus outside the scope of the statute. (Ill. Rev. Stat. 1979, ch. 110, par. 68.4(2).) If the checks from Jean's parents were gifts, then such payments were not because of or "in relation to a particular injury" but rather as a result of the love and affection for the donee. It is clear from the statute's language that the legislative intent was to reduce judgments only as a result of moneys "paid" or "payable" by reason of a legal obligation "in relation to a particular injury." We believe it would be an unwarranted exercise of judicial revisionism to extend the scope of section 68.4 beyond the scope of payments pursuant to a contractual obligation. The court below correctly refused to reduce the amount of the judgment.

For the reasons set forth, the decision of the Circuit Court of La Salle County is affirmed.

Affirmed.

ALLOY, P. J., and STOUDER, J., concur.