SHERWIN THIELE, Special Adm'r of the Estate of Andrew Thiele, Deceased, Plaintiff-Appellee, v. ARCADIO ORTIZ, Defendant-Appellant.

First District (2nd Division)   No. 86—2334

Opinion filed January 19, 1988.

Ann W. Regan and Randy J. Curato, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellant.

James P. Costello, of James P. Costello, Ltd., and David A. Novoselsky and Kathleen M. Krist, all of Chicago (David A. Novoselsky & Associates, of counsel), for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Dr. Arcadio Ortiz, appeals from a jury verdict rendered against him in the amount of $350,000 in a wrongful death suit based upon medical malpractice. Plaintiff, Sherwin Thiele, special administrator of his deceased son's estate, brought a cross-appeal alleging that the trial court erred when it denied his motion to quash defendant's post-trial motion as untimely and challenges the jurisdiction of this court to consider defendant's appeal.

The record shows that on August 5, 1980, 18-year-old Andrew Thiele (Andrew) was involved in a car accident and suffered serious injuries. He was treated by several doctors during four hospitalizations.

Andrew was treated at St. Theresa's Hospital in Waukegan, Illinois, immediately after the accident. He remained there until August 14, 1980. On that date, he was transferred to Lake Forest Hospital, where his fractured jaw was set and his mouth and jaw were wired shut. His treating physician was Dr. David Schimel. Andrew was discharged from Lake Forest Hospital on August 26, 1980.

After his discharge, Andrew experienced difficulty breathing. He was readmitted to Lake Forest Hospital on August 31, 1980, at which

time a tracheotomy was performed to enable him to breathe. Andrew's breathing difficulties continued. Additional tests were performed. After these tests, the doctors discovered that Andrew had a fractured trachea.

Dr. Agujar, a thoracic surgeon, was called in to surgically repair Andrew's fractured trachea. On September 1, 1980, Dr. Agujar told his partner, Dr. Ortiz, also a thoracic surgeon, about Andrew's condition. Dr. Agujar performed the surgery to repair Andrew's fractured trachea on September 2, 1980. The next day, Dr. Ortiz examined Andrew at the hospital.

On September 16, 1980, Dr. Ortiz performed a bronchoscopy on Andrew to check the healing process. The results showed that the hole in Andrew's windpipe had not yet healed. The following day, Dr. Ortiz examined Andrew, discharged him from the hospital, and scheduled a check-up appointment for September 21, 1980.

On September 19, 1980, however, while recuperating at home, Andrew began vomiting massive amounts of blood. That evening he was admitted to the Lake Forest Hospital emergency room. Both Dr. Schimel and Dr. Ortiz were called to the emergency room. It is undisputed that defendant was present in the emergency room at the time of Andrew's admission. Dr. Ortiz spoke with Dr. Schimel at the emergency room but did not examine Andrew.

Dr. Ortiz testified that Dr. Schimel told him that he believed Andrew had a bleeding stress ulcer. Dr. Ortiz accepted this statement, did not discuss Dr. Schimel's "suspicions" or agree with him on any specific diagnosis. He did not approach or examine Andrew, nor did he suggest that any tests be performed.

During trial, Dr. Ortiz maintained that Andrew was not his patient at that time. He testified that since Dr. Schimel was the primary physician and he thought Andrew's problem might have been a stress ulcer, "he [Schimel] probably would not need any consultant services and I left."

Andrew remained at the hospital, where he died on September 23, 1980. The evidence shows that Andrew had suffered a grand mal seizure and lapsed into a coma on September 22, 1980. The pathology report indicated that massive amounts of blood flowed into Andrew's windpipe. This led to a cardiac arrest and Andrew's death. Medical testimony at trial showed that Andrew suffered a tracheal innominate artery fistula (hereinafter TIF).

After Andrew's death, his father was appointed special administrator of his estate and brought this cause of action against Drs. Agujar and Ortiz for wrongful death based upon medical malpractice.

Plaintiff alleged that Dr. Agujar failed to properly treat Andrew during the course of the surgical repair of the trachea. The jury found in favor of Dr. Agujar and against the plaintiff. Accordingly, Dr. Agujar is not involved in this appeal.

The jury also returned a verdict in favor of the plaintiff and against defendant Dr. Ortiz in the amount of $350,000. The court entered judgment, denied post-trial motions, and this appeal and cross-appeal followed.

Dr. Ortiz asserts the following on appeal: (1) the trial court erroneously denied his motion for a directed verdict; (2) the trial court erroneously excluded evidence of Andrew's psychological history; (3) the trial court erroneously allowed testimony regarding damages for loss of consortium on behalf of Andrew's mother; (4) the trial court erroneously admitted testimony of Andrew's siblings; (5) the court erroneously instructed the jury; and (6) the jury's verdict was against the manifest weight of the evidence. Plaintiff brought a cross-appeal contending that this court does not have jurisdiction because the defendant's post-trial motion was not timely.

I

We will first consider plaintiff's cross-appeal because it challenges the jurisdiction of this court to consider defendant's appeal.

The judgment against the defendant was entered on April 17, 1986. Plaintiff contends that an order was entered on May 12, 1986, extending the time for the defendant to file his post-trial motion until June 16, 1986. Since the post-trial motion was filed on June 17, 1986, the trial court did not have jurisdiction to consider it. Therefore, the notice of appeal was not timely because it was based upon a defective post-trial motion. Based upon this analysis, plaintiff argues that this court does not have jurisdiction to consider defendant's appeal. We disagree.

Section 2—1202 of the Code of Civil Procedure requires that post-trial motions be filed "within 30 days after entry of judgment." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1202(c).) Thirty days after judgment would fall on May 17, 1986. Since the due date fell on a Saturday, the defendant would have until Monday, May 19, 1986, to file. Rules of the Circuit Court of Cook County, R. 0.3.1(b)(1985).

The trial court may grant an extension within the 30 days. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1202(c).) On May 12, 1986, within 30 days of the entry of the judgment, the trial court extended the time for the defendant to file his post-trial motion "an additional 30 days." Defendant contends the order means that the post-trial motion was

due on June 19, 1986, which is "an additional 30 days" from the original due date of May 19, 1986. The post-trial motion was timely because it was filed on June 17, 1986, two days before the expiration of the extension.

Plaintiff filed a motion to quash defendant's post-trial motion on the ground that it was untimely. The trial court denied plaintiff's motion. It held that although its May 12, 1986 order read that it was extending the time for the defendant to file his post-trial motion for "an additional 30 days or until June 16, 1986," the reference to June 16, 1986, was a clerical error. The order was based on the mistaken belief that the judgment was entered on April 16 rather than April 17, 1986. Therefore, the order should have read "an additional 30 days or until June 17, 1986." Defendant's post-trial motion was filed on June 17, 1986.

A court has inherent power to make an entry *nunc pro tunc* at any time, even after the expiration of its term, to correct a clerical error or matter of form so that the record reflects the actual order of judgment rendered by the court when such entry is based on a definite and certain record. *Johnson v. First National Bank* (1984), 123 Ill. App. 3d 823, 827, 463 N.E.2d 859, *appeal denied* (1984), 101 Ill. 2d 565.

The trial court properly denied plaintiff's motion to quash. This court has jurisdiction to consider defendant's appeal.

## II

One of defendant's principal arguments in seeking a reversal is that Andrew was not his patient when the paramedics brought him into the emergency room of Lake Forest Hospital on the evening of September 19, 1980. The record does not support this argument.

The defendant, Dr. Ortiz, his partner, Dr. Agujar, and Dr. Schimel are identified as the attending physicians on the hospital charts. A surgeon is required to continue to care for his patient until the threat of post-operative complications is over. *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 88, 414 N.E.2d 520, *appeal denied* (1981), 83 Ill. 2d 570.

On September 2, 1980, Dr. Agujar performed surgery on Andrew's trachea. On the preceding day, September 1, 1980, the defendant was informed by his partner of this surgery. On the day following the surgery, September 3, 1980, Dr. Ortiz saw Andrew professionally for the first time. Thereafter, on Tuesday, September 16, 1980, Dr. Ortiz performed a bronchoscopy on Andrew. On Wednesday, September 17, 1980, Dr. Ortiz checked Andrew's trachea and autho-

rized his discharge from the hospital. Dr. Ortiz was aware that TIF is a known complication that could develop in cases of this type. Therefore, a follow-up examination was scheduled for Monday, September 22, 1980, at Dr. Ortiz' office.

Two days after leaving the hospital with the defendant's approval, and three days before his scheduled follow-up office appointment with the defendant, Andrew was brought into the emergency room of Lake Forest Hospital. It is undisputed that Dr. Ortiz was called to the emergency room by the emergency room physician. In effect, Andrew's post-operative checkup with Dr. Ortiz, by circumstances, was accelerated from Monday, September 22, 1980, to Friday, September 19, 1980. Dr. Ortiz concedes that Andrew would have been his patient if he had kept his office appointment on Monday, September 22, 1980.

We therefore conclude that defendant's argument that a doctor-patient relationship did not exist is without merit.

## III

Having determined that a doctor-patient relationship did exist, we now consider the defendant's argument that the plaintiff failed to properly establish a standard of care, deviation and causation. Defendant contends that the trial court erred when it failed to direct a verdict in his favor.

■ On a motion for directed verdict, the role of the trial court is to view all the evidence in the light most favorable to the nonmovant and decide whether a verdict for the nonmovant could ever stand. (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216.) Any evidence, and all reasonable inferences therefrom, shall be construed against the movant. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Zieger v. Manhattan Coffee Co.* (1983), 112 Ill. App. 3d 518, 445 N.E.2d 844.) Verdicts should be directed only in those cases in which all of the evidence when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand. *Agnello v. Puzzo* (1982), 110 Ill. App. 3d 913, 443 N.E.2d 648.

■■ ■ To avoid a directed verdict in a medical malpractice case, plaintiff must establish the standard of care the doctor was required to meet, demonstrate a deviation from that standard, and finally indicate how the deviation resulted in harm to the plaintiff. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 48, 463 N.E.2d 216, *appeal denied* (1984), 101 Ill. 2d 567.) The general rule is that the standard of care must be established by expert testimony. (*Le-*

*brecht v. Tuli* (1985), 130 Ill. App. 3d 457, 471, 473 N.E.2d 1322, *appeal denied* (1985), 106 Ill. 2d 555.) Such expert testimony may be supplied by the defendant doctor himself. *Metz v. Fairbury Hospital* (1983), 118 Ill. App. 3d 1093, 1097, 455 N.E.2d 1096.

■ In the case at bar, the trial court properly denied defendant's motion for a directed verdict. Plaintiff established the standard of care Dr. Ortiz was required to meet, demonstrated a deviation from that standard, and indicated how the deviation resulted in harm to the plaintiff. Plaintiff accomplished this not only through the expert testimony of Dr. Bakst, but also relied upon the testimony of the defendant himself to establish a deviation.

It is undisputed that the defendant did not just wander by the emergency room. He was officially called by the emergency room physician. Plaintiff's expert, Dr. Bakst, testified that if Dr. Ortiz was called to the emergency room when Andrew was brought in that Friday night and told of the massive bleeding, it was incumbent on Dr. Ortiz to tell somebody that a complication could be the cause of the bleeding. Dr. Bakst stated that Dr. Ortiz should have suggested to Dr. Schimel that Andrew might have a TIF.

Dr. Ortiz testified that a TIF is a life-threatening complication. He stated that it is a complication which a doctor must "get right on" after confirming it by bronchoscopy to be a TIF. If a doctor does not attend to this immediately, grave results will occur. However, on appeal, Dr. Ortiz argues that he was informed that Andrew was vomiting blood and that in diagnosing the existence of a TIF, the coughing of blood, as opposed to vomiting blood, is a critical symptom. The record does not support this argument under the facts of this case.

When Dr. Ortiz was asked whether a patient who had his jaws wired shut, like Andrew, who had a TIF could manifest it by throwing up blood as opposed to coughing it up, he said, "I don't believe so." On the other hand, Dr. Charles Kittle, defendant's expert, stated that one would expect that a thoracic surgeon would know that a TIF could manifest itself by vomiting blood in a patient whose jaws were wired. Dr. Kittle was the past chairman of the Board of Thoracic Surgeons. Dr. Schimel also concluded that a patient with wired jaws could manifest a TIF by vomiting blood as opposed to coughing it up. Dr. Ortiz did, however, agree that if a patient had a fistula in the artery and it couldn't get out, it would make sense that it would go down the patient's food tube to his stomach if it were happening slow enough.

In the case at bar, plaintiff's expert, Dr. Bakst, established the standard of care Dr. Ortiz was required to meet as a thoracic surgeon

in regard to recognizing a TIF as a known complication of a trachea repair. Massive bleeding, generally when it is coughed up, can confirm the diagnosis of a TIF. Immediate surgery is required. In the case at bar, plaintiff was vomiting up massive quantities of blood just days after Dr. Ortiz had performed the bronchoscopy. Dr. Ortiz was informed of this fact when he was called to the emergency room on the day Andrew was brought in.

Dr. Ortiz failed to take into consideration that since Andrew's jaws were wired shut, the vomiting up of blood, instead of coughing up, could be a sign of a TIF. Dr. Ortiz left the premises after speaking with Dr. Schimel without examining Andrew, even though he had a scheduled appointment with the patient three days later.

Dr. Ortiz was not free to "do nothing" in this situation. Dr. Ortiz, as a thoracic surgeon who treated Andrew, had a duty to continue his treatment of Andrew. Surgeons are required to continue caring for their patients until the threat of post-operative complication is past. (*Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 88, 414 N.E.2d 520, *appeal denied* (1981), 83 Ill. 2d 570.) Dr. Ortiz breached the duty to continue caring for Andrew when he left him that Friday night in the emergency room without first examining him.

When this evidence is viewed in the light most favorable to plaintiff, no verdict could ever stand for the defendant. The evidence does not so overwhelmingly favor the defendant that no contrary verdict based on the evidence could ever stand. (*Agnello v. Puzzo* (1982), 110 Ill. App. 3d 913, 443 N.E.2d 648.) The jury correctly found Dr. Ortiz negligent and the trial court properly denied defendant's motion for a directed verdict.

### IV

■ Defendant contends that the trial court erroneously excluded evidence. Defendant sought to introduce records and testimony concerning past psychological evaluations of Andrew. These evaluations were done when Andrew was $9\frac{1}{2}$ years old and again when he was 14 years old. After an *in camera* inspection, the court excluded the evidence because: (1) it was privileged under the Mental Health and Developmental Disabilities Confidentiality Act (the Act) (Ill. Rev. Stat. 1985, ch. $91\frac{1}{2}$, par. 801 *et seq.*); and (2) it was too remote.

The Act provides that all records and communications kept by a therapist or agency in the course of providing mental health and developmental disability services shall be confidential and not be disclosed except as provided under the Act. Ill. Rev. Stat. 1985, ch. $91\frac{1}{2}$, par. 803.

The Act provides two exceptions. First, section 5(e) provides that the records shall remain confidential after the death of a recipient and shall not be disclosed without consent or unless disclosure is authorized by court order after an *in camera* inspection and upon good cause shown. This exception is not applicable in this instance because there was no consent and defendant failed to make a showing of good cause.

The second exception provides that such records may be disclosed in a civil proceeding after death when the recipient's mental or physical condition has been introduced as an element of his claim or defense claiming or defending through or as a beneficiary of the recipient, provided that the court finds, after an *in camera* examination, that: (1) it is relevant, probative and otherwise clearly admissible; (2) other satisfactory evidence is not available regarding the facts sought to be established by such evidence; and (3) the disclosure is more important to the interest of substantial justice than protection from any injury which disclosure is likely to cause. Ill. Rev. Stat. 1985, ch. 91½, par. 810(a).

The purpose of section 10(a) is to preserve the confidentiality of the records and communication of the person who is receiving or who has received mental health services. *Novak v. Rathnam* (1985), 106 Ill. 2d 478, 483, 478 N.E.2d 1334.

Defendant maintains that under the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, pars. 1, 2), a claim for damages for loss of society directly relates to decedent's mental state regarding his relationship with his family. Defendant reasons that plaintiff introduced testimony on companionship, love and affection in order to prove those damages. Therefore, any evidence of decedent's mental condition is probative and relevant to those relationships.

While there is some logic to this argument, no authority has been cited. We recognize that under the Wrongful Death Act, only recovery for pecuniary injuries is permitted and parents are presumed to have suffered pecuniary injury in the loss of a child's society. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 517, 468 N.E.2d 1228.) Thus, in essence, defendant is claiming a right to present the proffered evidence to rebut evidence presented by the plaintiff.

The exceptions within the Act and case authority demonstrate that psychological records are only relevant when plaintiff's damages include an affirmative claim for mental loss. (*Webb v. Quincy City Lines, Inc.* (1966), 73 Ill. App. 2d 405, 219 N.E.2d 165.) In *Webb*, the court held that a claim for pain and suffering did not place the mental condition of the plaintiff at issue and therefore the privilege of confi-

dentiality was applicable. (*Webb*, 73 Ill. App. 2d 405, 219 N.E.2d 165.) In *Tylitzki v. Triple X Service, Inc.* (1970), 126 Ill. App. 2d 144, 261 N.E.2d 533, the court held that unless mental well-being is specifically made an issue by the pleadings, the privilege of confidentiality is applicable. We conclude that in the case *sub judice*, Andrew's mental state was not at issue.

To permit such evidence under the circumstances of this case would erode the express statutory exceptions contained in the Act. That would result in opening a Pandora's box of inquiry into the mental condition of claimants. (See *Webb*, 73 Ill. App. 2d 405, 219 N.E.2d 165.) It is not difficult to consider the many ways in which it would be argued that the mental conditions of claimants are at issue. Soon there would exist more areas of inquiry deemed exceptions to the privilege than there would be areas of inquiry protected by the privilege. (See *Tylitzki* 126 Ill. App. 2d 144, 261 N.E.2d 533.) The privilege of confidentiality is far too important to be brushed aside when, as here, the mental condition of the plaintiff may be only peripherally involved.

Thus, it follows that a claim for loss of society under the Wrongful Death Act does not place the decedent's mental condition at issue for the purposes of falling within the exceptions to the Act. (Ill. Rev. Stat. 1985, ch. 91½, par. 810(a).) Accordingly, we conclude that under the circumstances of the instant case, the privilege of confidentiality expressed by the legislature by enacting the Act should override defendant's claim for disclosure. The privilege of confidentiality is far too important to be eroded by the expansive construction defendant seeks. Thus, the evidence was properly excluded.

### V

■ Defendant contends that the court erroneously denied his motion *in limine* seeking to bar any reference or testimony concerning damages suffered by decedent's mother, Ann Thiele. The basis for defendant's motion was that Ann Thiele was deceased and her estate was not named as a party in this case. Defendant submits that since an estate was never opened for Ann Thiele, any testimony about her was improper. Defendant urges that the evidence regarding damages suffered by Ann Thiele deprived him of a fair trial. We disagree.

The record shows that Andrew died in September 1980. His mother, Ann Thiele, died in 1983. An injured person should be compensated whether that injured person is alive or dead. (*Raisl v. Elwood Industries, Inc.* (1985), 134 Ill. App. 3d 170, 479 N.E.2d 1106, *appeal denied* (1985), 108 Ill. 2d 586.) Indeed, a wrongful death action

survives for the benefit of the decedent's estate.

Plaintiff's counsel advised the court of a stipulation between the parties that Mr. Thiele was the administrator of Ann Thiele's estate. This was done prior to plaintiff's resting his case in chief. Defendant made no objection at that time.

Subsequently, after arguments for directed verdicts, plaintiff's counsel advised the court that the parties stipulated that he would present an order appointing Sherwin Thiele as the administrator of Ann Thiele's estate. Defendant responds that stipulation was dependent upon plaintiff's counsel submitting the order, which he failed to do.

We conclude that defendant is bound by his stipulation of record. The stipulation was reasonable, it did not violate public policy, and there is no evidence or allegation of fraud. (*In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 208, 445 N.E.2d 811.) Moreover, the court's instructions clearly informed the jury who the parties were and who was entitled to damages. Thus, any error that may have resulted from plaintiff's failure to submit a written order was minimal and defendant was not prejudiced in any way. Therefore, any error was harmless.

## VI

■■■ Defendant alleges that the trial court erred in failing to strike the testimony of decedent's brother and sister. Defendant claims that their testimony amounted to evidence of loss of consortium and he was unduly and unfairly prejudiced by the erroneous admission of the testimony.

The defendants moved, *in limine*, to bar all reference or testimony regarding loss of consortium on behalf of the decedent's siblings. The court granted defendant's motion after the testimony was presented.

Defendant relies solely upon the case of *Prendergast v. Cox* (1984), 128 Ill. App. 3d 84, 470 N.E.2d 34, for the proposition that in Illinois, siblings are not entitled to recover damages for loss of society under the Illinois Wrongful Death Act.[1] This argument misses the point.

---

[1]In *Sheahan v. Northeast Illinois Regional Commuter R.R. Corp.* (1986), 146 Ill. App. 3d 116, 496 N.E.2d 1179, the court held that adult siblings were entitled to recover for loss of society under the Wrongful Death Act. Accord *Maga v. Motorola, Inc.* (1987), 163 Ill. App. 3d 524, holding that under the facts of that case, parents and siblings of decedent are not "next of kin" within the meaning of section 2 of the Wrongful Death Act.

Plaintiff did not seek damages for loss of consortium for the adult sibling. The record shows that the testimony at issue was brief and followed by a clarifying instruction to the jury. In addition, the court instructed the jury on the proper measure of damages. The error, if any, was harmless.

## VII

Defendant contends that plaintiff's hypothetical question to his medical expert was improper because it included facts not in evidence. This argument is not persuasive.

■■■ Plaintiff's expert testified that he relied on information contained in the hospital charts. An expert, even though not the treating physician, may give his response to a hypothetical question based on facts contained in hospital records not introduced into evidence. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 195, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) Therefore, the hypothetical question was proper.

## VIII

Defendant contends that a series of instruction errors, individually or cumulatively, deprived him of a fair trial.

■■■ Defendant contends that IPI Civil 2d No. 10.01 (Illinois Pattern Jury Instructions, Civil, No. 10.01 (2d ed. 1971) (hereinafter IPI Civil 2d)), the definition of negligence, should not have been given because it is inconsistent with the malpractice instructions given, confused the jury, and permitted the jury to consider nonexpert testimony. Defendant has failed to cite any authority in support of this argument.

The record shows that the trial court gave the following instructions: IPI Civil 2d No. 10.01, definition of negligence; IPI Civil 2d No. 105.01, Duty of Physician, Surgeon, Dentist; and IPI Civil 2d No. 105.02, Duty of Specialist.

A review of the record demonstrates that the instructions complemented each other. The malpractice instruction includes the terms negligence. Thus, the definition of negligence was necessary and proper. See, *e.g., Northern Trust Co. v. Louis A. Weiss Memorial Hospital* (1986), 143 Ill. App. 3d 479, 492-93, 493 N.E.2d 6, *appeal denied* (1986), 112 Ill. 2d 579.

It is not necessary to burden this opinion by reviewing each instruction that defendant claims to be erroneous. Our examination of the record leads us to the conclusion that the instructions, individually or collectively, do not rise to the level of reversible error.

## IX

Finally, defendant asserts that the verdict was against the manifest weight of the evidence and could only have been the result of passion or prejudice.

A jury verdict is contrary to the manifest weight of the evidence only if wholly unwarranted by the evidence or if clearly a result of passion or prejudice. (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 482, 483 N.E.2d 711, *appeal denied* (1986), 111 Ill. 2d 566.) A jury verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony. *Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 425, 461 N.E.2d 551. The evidence in this case was sufficient to support the verdict.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and SCARIANO, JJ., concur.