RICHARD SWAW, Plaintiff-Appellee and Separate Appellant, v. GERALD KLOMPIEN, Defendant-Appellant (Nahim Nasralla, Defendant and Separate Appellee).

First District (2nd Division)   No. 87—0939

Opinion filed March 29, 1988.

706

Mark C. Fedota, Kay L. Schichtel, and Steven E. Danekas, all of Wildman, Harrold, Allen & Dixon, of Chicago, for appellant Gerald Klompien.

Donald F. Hemmesch, Jr., and Dean M. Athans, both of Taslitz, Smith & Hemmesch, of Chicago, for appellant Richard Swaw.

Brian T. Henry, Robert Marc Chemers, and Robert J. Franco, all of Pretzel & Stouffer, Chartered, of Chicago, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Dr. Gerald Klompien, appeals from a jury verdict rendered against him in the amount of $510,450.68 in a medical malpractice action. Plaintiff appeals from a jury verdict rendered in favor of codefendant, Dr. Nahim Nasralla.

Plaintiff and his wife were married when both were 18 years old. In 1983, they had two sons, ages nine and six. They decided to seek medical advice regarding family planning. Plaintiff's wife contacted her gynecologist, who suggested that Mr. Swaw undergo a vasectomy. She referred the Swaws to defendants, both general surgeons associated with each other in practice.

Mr. Swaw and his wife first visited the doctors' office on March 24, 1983. During that visit, Dr. Klompien explained the vasectomy procedure. He gave plaintiff a document entitled "Vasectomy Instructions." The document explained how Mr. Swaw was to prepare for the vasectomy and what he was to do after the vasectomy. The document also mentioned possible complications of the vasectomy, including pain, swelling and discoloration, and advised Mr. Swaw to contact the doctors if he had any problems.

Subsequently, Mr. Swaw and his wife decided that he would undergo a vasectomy and scheduled an appointment for April 22, 1983.

On that day, a Friday, Mr. Swaw and his wife arrived at the doctors' office at approximately noon. Both Drs. Klompien and Nasralla performed the bilateral vasectomy while Mr. Swaw's wife waited in another room.

The doctors testified that they did not encounter any unusual problems during the surgery. Plaintiff remained in the doctors' office for about an hour before returning home. At home, Mr. Swaw placed ice over the incisions on his scrotum, took the prescribed medication, and slept until the next morning, Saturday, April 23, 1983.

Upon wakening, he noticed some swelling and a "little lump" in his left groin. He applied ice as directed but the lump continued to get larger and his discomfort continued. He phoned Dr. Nasralla, who advised him to continue to apply ice and call back if there were any other problems.

The next day, Sunday, the swelling and pain continued so plaintiff phoned the doctors' office and left a message. Dr. Klompien returned the call.

At this point, plaintiff's "left testicle had gotten larger, it was black, his penis was black with two bulging sacks of blood at the tip, his buttocks and upper left thigh were black and blue and the left side of his abdomen up to the navel and out to the hip was also grossly discolored." When plaintiff saw the extent of the swelling and discoloration, "he thought he was dying."

Dr. Klompien told plaintiff to apply heat, take hot baths, and call Monday to arrange an appointment if the discomfort continued.

On Monday, the discoloration, swelling and pain continued and plaintiff's wife scheduled an appointment for Tuesday. Dr. Klompien examined plaintiff on Tuesday and prescribed medication. Plaintiff's symptoms continued but he had less pain on Wednesday. By Thursday, April 28, 1983, the pain became so severe that the plaintiff went to the hospital where he was examined by both defendant doctors.

Dr. Klompien continued to treat the plaintiff through June 13, 1983. The doctors told plaintiff that his pain and discomfort could last six months to a year. When the symptoms persisted beyond this period, Mr. Swaw consulted other physicians who eventually referred him to a urologist in October 1984. Surgery, performed by the urologist in February 1985, relieved much of the pain but physical activity continued to cause extreme discomfort. The possibility of additional surgery to obtain relief was suggested, but the plaintiff declined when advised of the potential benefits and hazards of the procedure.

Plaintiff brought suit against both doctors alleging negligent care and treatment. Plaintiff testified that although subsequent surgery

relieved much of his pain, virtually any activity still causes a feeling as though someone has either kicked him or is pulling on the left testicle.

Plaintiff returned to work in May 1983, but did not otherwise resume his normal lifestyle. The commissioner of the Amateur Softball Association testified that prior to the alleged negligence of the doctors, the plaintiff actively participated as a highly regarded 16-inch softball player in the Chicago area and could have continued in that capacity for many years. In 1983, plaintiff's sons, then ages nine and six, were in the process of getting into organized baseball. He practiced with them to improve their skills. His condition prevents him from continuing this activity.

During the winter months, he bowled with his family and played hockey with his sons in their driveway. During the summer months, he enjoyed boating, swimming and skiing at the family's summer cottage. He can no longer participate in any of these activities. His wife now describes him as a "couch potato."

Although he can still engage in marital relations with his wife, the activity is painful and less frequent.

Family members corroborated plaintiff's testimony. Plaintiff's wife described his symptoms and the phone calls to the doctors. She told of taking her husband to the hospital on April 28, where both doctors examined him. Dr. Klompien told her that her husband had a hematoma, he should stay in bed and keep applying heat to the area. He also told her that her husband should not be in that much pain and he should not be such a "big baby."

The plaintiff presented the testimony of his expert, Dr. Swerdlow, a general surgeon. Both defendants testified during plaintiff's case in chief as adverse witnesses.

The medical evidence established that while some swelling, discoloration and hematoma commonly occurs following a vasectomy, plaintiff developed a rare post-operative complication.

Plaintiff's expert testified that surgeons are responsible for post-operative care. If the patient in the post-operative period calls for help complaining about something unusual, it behooves the surgeon to see that patient and make an early and rapid diagnosis to prevent a simple complication from becoming a major complication. He also testified that the standard of care required Dr. Klompien to examine plaintiff on Sunday. He stated that when a post-operative hematoma grows to a massive size, it is associated with post-operative disability, pain, discomfort and formation of fibrotic tissue. Surgical principles dictate that when a hematoma becomes massive, it must be drained,

packed off and the bleeding must be stopped. He opined that the failure to examine Mr. Swaw on Sunday, April 24, 1983, prevented Dr. Klompien from making the necessary judgment concerning the proper course of treatment and defendant's failure to do so was causally related to plaintiff's pain and discomfort. He also stated that Mr. Swaw will continue to have pain for the rest of his life.

At trial, each defendant testified that he could not recall his telephone conversation with Mr. Swaw on the Saturday and Sunday following the vasectomy. Defense testimony showed that it was unlikely that plaintiff had phone conversations with each doctor on the weekend after the surgery because the doctors alternated being on call on weekends. Only one doctor would be available on that weekend. Consequently, both of them did not speak to the plaintiff on the same weekend. Although they vigorously disputed the conversations at trial, for the purposes of this appeal, defendants admit to plaintiff's telephone conversations with Dr. Nasralla on Saturday and Dr. Klompien on Sunday.

The defense also presented evidence that the doctor on weekend duty did not merely listen to patients passively before prescribing a course of treatment. It was the custom and practice of the office for the doctor on duty to aggressively pursue the existence of symptoms that may require the immediate personal attention of the doctor, referral to the emergency room of the hospital, or the setting of an office appointment for the next day.

Dr. Klompien testified that even if he had examined Mr. Swaw on Sunday, he would not have drained the hematoma since his office notation from the following Tuesday's examination revealed, by lack of negative notes, that the hematoma was neither expanding nor jeopardizing the testicle on Sunday.

One of defendants' experts, Dr. Wohlberg, testified that Dr. Klompien met the standard of care. It was not necessary to examine Mr. Swaw on Sunday. He opined that Mr. Swaw's hematoma had fully expanded prior to the first phone call on Saturday. The swelling was indicative of expansion and based upon his review of the records and depositions, the swelling began to decrease early Saturday. Another defense expert, Dr. Schaeffer, testified that Dr. Nasralla met the standard of care because the symptoms that plaintiff complained of on Saturday were typical for the first post-operative day.

The jury returned verdicts against Dr. Klompien and in favor of Dr. Nasralla. The trial court denied post-trial motions and entered judgments on the verdicts. Dr. Klompien appeals from the judgment against him, seeking judgment notwithstanding the verdict, a new

trial, or a remittitur. Plaintiff brought a separate appeal against Dr. Nasralla, seeking a new trial on the ground that the trial court erroneously limited plaintiff's cross-examination of defendant's medical expert.

## I

First we will discuss Dr. Klompien's assignments of error. He contends that the trial court erred in not entering a judgment notwithstanding the verdict.

■■ A party is entitled to a judgment *n.o.v.* only in cases where all the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 299 N.E.2d 504.) A jury's verdict will be overturned when it is against the manifest weight of the evidence. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322, *appeal denied* (1985), 106 Ill. 2d 555.) A verdict is contrary to the manifest weight only if it is wholly unwarranted by the evidence, and not when the evidence is merely conflicting and the jury resolves the conflict. 130 Ill. App. 3d at 471.

The application of the *Pedrick* standard to medical malpractice cases requires the reviewing court to scrutinize the medical evidence submitted by plaintiffs in support of their case. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 48, 463 N.E.2d 216, *appeal denied* (1984), 101 Ill. 2d 567.) After reviewing all of the evidence, we find that defendant's motion for a judgment *n.o.v.* was properly denied.

## A

Defendant contends that the trial court erred when it denied his motion notwithstanding the verdict of the jury because the plaintiff failed to properly establish a standard of care.

■ In a medical malpractice case, the plaintiff must establish the standard of care the doctor was required to meet, demonstrate a deviation from that standard, and finally, show how the deviation resulted in harm to the plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279.) Where the parties offer conflicting medical testimony regarding the applicable standard of care and defendant's breach of that standard, the jury is uniquely qualified to resolve the conflict, and a judgment *n.o.v.* is not proper. *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 479 N.E.2d 1000.

■ In the present case, the sole issue before the jury, concerning

Dr. Klompien, was whether his failure to examine the plaintiff on Sunday was negligent.

Defendant argues that the plaintiff failed to establish that the appropriate standard of care required the defendant to see his patient on Sunday, because that opinion was given by plaintiff's medical expert in response to a hypothetical question which assumed facts that were not in evidence. Defendant complains that "Mr. Swaw's counsel chose to pose a hypothetical not supported by the evidence but one that would elicit the desired opinion from Dr. Swerdlow." Defendant was represented by able and experienced trial counsel who was aware that such a question is objectionable. Since no objection was made at trial, this issue is waived on appeal.

Defendant's cross-examination of Dr. Swerdlow reveals the strategy behind counsel's failure to object. In *Grabner v. American Airlines, Inc.* (1980), 81 Ill. App. 3d 894, 898, 401 N.E.2d 1196, *appeal denied* (1980), 81 Ill. 2d 591, the court held that "the best way for opposing counsel to deal with a hypothetical whose assumptions are drawn from disputed or controverted evidence" is to ask the expert on cross-examination if the answer to the hypothetical would change given different circumstances. The *Grabner* court went on to explain that even if the original hypothetical assumed facts not in evidence, the error would be rendered harmless when the hypothetical was changed on cross-examination.

During the cross-examination of Dr. Swerdlow in this case, the defendant changed the hypothetical, asking Dr. Swerdlow to assume facts consistent with the theory of the defendant's case and elicited responses from the plaintiff's own expert which favored the defendant. When Dr. Swerdlow was asked to assume that neither Dr. Nasralla nor Dr. Klompien was called by the plaintiff on Saturday or Sunday as alleged by the plaintiff, he responded that under those facts "there is no deviation."

Thus, the error raised by the defendant was not only waived but also cured on cross-examination.

*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, eliminated many of the technicalities previously associated with the presentation of expert testimony. Our examination of the record reveals that Dr. Swerdlow's expert opinion was also based on his examination of medical records, the depositions of plaintiff and his wife, and the depositions of Drs. Nasralla and Klompien. Therefore, the enlightened reasoning of *Wilson* further supports the propriety of the expert opinion evidence.

## B

■ Defendant also contends that the trial court should have entered judgment in his favor because the plaintiff failed to prove that the defendant deviated from the established standard of care.

The critical facts surround the communication between the defendant and his patient on Sunday, April 24, 1983. It was the function of the jury to determine if the evidence supported plaintiff's theory that he communicated a sense of urgency to his physician which required the physician to examine the patient. Defense testimony cast doubt on the existence of the Sunday conversation and thereby challenged the credibility of the plaintiff. Since he was not called, Dr. Klompien would have no reason to examine the plaintiff on that Sunday. In addition, defense counsel obtained an admission from Dr. Swerdlow, plaintiff's expert, that if no calls were made to either Dr. Nasralla or Dr. Klompien on Saturday or Sunday, "there is no deviation" of the standard of care.

Obviously, the case was clear to the jury. They determined that defendant was called by the plaintiff on Sunday; that a sense of urgency was communicated; and that it required Dr. Klompien to see and examine the plaintiff. This clear understanding is reinforced by the fact that the jury returned a verdict in favor of Dr. Klompien's partner or associate. In his case, the jury believed that the plaintiff called Dr. Nasralla on Saturday, the symptoms were normal and expected and, therefore, no sense of urgency existed.

The defendant doctors, who associated with each other in practice, performed the vasectomy on plaintiff on Friday. A surgeon is required to continue to care for his patient until the threat of post-operative complications is past. (*Thiele v. Ortiz* (1988), 165 Ill. App. 3d 983, citing, *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 88, 414 N.E.2d 520, *appeal denied* (1981), 83 Ill. 2d 570.) By his own testimony, Dr. Klompien established that his custom and routine procedures included speaking with his patients and aggressively inquiring about their symptoms. If the patients had questions, doubts or continuing pain, he would tell them they could see him or if it was something very bad, he would tell them they could go to the emergency room. Thus, by defendant's own testimony, it would appear that based on the phone conversation between Dr. Klompien and the plaintiff, which admittedly took place for purposes of this appeal, Dr. Klompien should have suspected that the plaintiff was experiencing unusual complications. Surely the severity of plaintiff's symptoms and plaintiff's fears were worthy of an examination by one of the surgeons who had performed a vasectomy two days earlier.

The jury heard the evidence and heard the defendant's claims that he could not recall the phone conversation. They also heard extensive expert medical testimony. The conflicting expert medical testimony presented a classic question of fact to be resolved by the jury. (*Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 1093, 466 N.E.2d 1085.) We do not believe that the evidence so overwhelmingly favored defendant as to require entry of judgment *n.o.v.* in his favor.

## C

Next, defendant contends that plaintiff failed to prove proximate cause. He asserts that the record is bare of any testimony showing that the defendant's negligence was more probably than not the cause of plaintiff's injuries. Defendant's argument appears to be directed to the form of the questions propounded to the plaintiff's expert witness rather than the substance.

■ A plaintiff sustains his burden of proving, generally through expert testimony, that defendant's breach of the applicable standard of care is more probably than not the cause of plaintiff's injury. (*Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 1092, 466 N.E.2d 1085.) Proximate cause is not established, however, where the causal connection is "contingent, speculative or merely possible." *Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 136, 229 N.E.2d 171, *appeal denied* (1967), 37 Ill. 2d 625.

The term "proximate" refers to a legal standard, not a medical one. (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 515 N.E.2d 68.) Plaintiff's expert's testimony showed, to a reasonable degree of medical certainty, that the defendant's negligence caused or contributed to plaintiff's injuries. Dr. Swerdlow opined that the failure to examine and drain the hematoma caused fibrotic tissue to develop which was the cause of plaintiff's continued pain and discomfort.

Dr. Swerdlow testified that the standard of care required corrective surgery of plaintiff's massive hematoma and testified on both direct and cross-examination that the plaintiff's injury was directly and causally related to the untreated hematoma and the fibrosis and scarring that resulted from it. "An expert opinion held to a reasonable degree of medical certainty obviously furnishes an adequate basis for a jury's finding that causation was proved by a preponderance of the evidence." *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 337, 515 N.E.2d 68.

Viewing all of the evidence in its aspect most favorable to the plaintiff, we cannot say that it overwhelmingly favors defendant and that no contrary verdict would ever stand. Accordingly, defendant's

motion for judgment *n.o.v.* was properly denied.

## II

■ Next, defendant asserts that he is entitled to a new trial because the trial court erroneously permitted plaintiff's expert to testify on the extent and permanency of plaintiff's injury. He contends that plaintiff's expert opinion regarding plaintiff's prognosis was not disclosed by plaintiff prior to trial. Thus, under Supreme Court Rule 220 (107 Ill. 2d R. 220), that testimony should have been barred. We disagree.

Rule 220 provides:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 107 Ill. 2d R. 220(d).

The admission of evidence rests within the sound discretion of the trial court. That decision will not be reversed absent a clear abuse of discretion. *Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 411, 444 N.E.2d 220.

Dr. Swerdlow opined that plaintiff's pain would last for the rest of his life. His opinion was based upon the medical records and depositions, and defendant had every opportunity to cross-examine the doctor. Defendant never sought an independent physical examination of the plaintiff.

Dr. Swerdlow's testimony was neither inconsistent nor beyond the scope of the discovery proceedings. His opinion concerning the extent and permanency of plaintiff's injury simply was not developed during his deposition. Thus, the admission of the evidence was not an abuse of discretion.

## III

■ Next, defendant contends that the verdict is not supported by the evidence. A verdict is said to be against the manifest weight of the evidence where it is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable and not based upon the evidence. When considering whether a verdict is contrary to the manifest weight of the

evidence, a reviewing court must review the evidence in the light most favorable to the appellee. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232.) A jury verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony. (*Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 425, 461 N.E.2d 551.) Clearly, the evidence presented in this case was sufficient to support the verdict.

Defendant also contends that the conduct of plaintiff's counsel during trial and closing argument resulted in prejudice and error. This argument is unpersuasive. The fact that the jury found in favor of plaintiff and against defendant Dr. Klompien, but in favor of defendant Dr. Nasralla and against plaintiff, clearly demonstrates that the jury's verdict was indeed based on the evidence presented and the weight to be given that evidence, upon their determination of the credibility of the witnesses and the court's instructions on the law.

## IV

Finally, defendant contends that the $510,450.68 verdict is grossly excessive, unreasonable, unwarranted by the evidence, and tainted by improper and prejudicial considerations. First, defendant asserts that since plaintiff's total special damages, including medical expenses and lost wages, did not exceed $10,000, the verdict is excessive. Second, defendant argues that the verdict is not reasonably related to the nature, extent and duration of plaintiff's injuries.

■ The test to be used when examining a verdict challenged as being excessive is whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*LeMaster v. Chicago Rock Island & Pacific Ry. Co.* (1976), 35 Ill. App. 3d 1001, 1030, 343 N.E.2d 65, *appeal denied* (1976), 63 Ill. 2d 552.) A reasonable balance should be made between the amount of damages and the extent of the injuries. There is no precise rule by which an award of damages can be fixed in a personal injury action because such compensation does not lend itself to mathematical computation. *LeMaster*, 35 Ill. App. 3d at 1030.

The amount of a verdict is generally a factual question within the discretion of the jury as triers of fact. (*Clark v. City of Chicago* (1980), 88 Ill. App. 3d 760, 410 N.E.2d 1025, *appeal denied* (1981), 82 Ill. 2d 583.) A precise dollar amount of compensation for pain and suffering or permanent disability is not necessarily related to the

amount of medical expenses. Medical bills are not conclusive as to the appropriate size of a verdict. *Ludgin v. John Hancock Mutual Life Insurance Co.* (1986), 145 Ill. App. 3d 703, 710, 495 N.E.2d 1237, *appeal denied* (1986), 113 Ill. 2d 560.

■■ At the time the vasectomy was performed, plaintiff and his wife were 29 years old. They were married for 11 years and enjoyed a happy family life with their two sons. It is not necessary to repeat the details surrounding the radical change that ensued. The evidence established that the injury was severe and permanent and that plaintiff will have to endure a degree of pain and suffering for the rest of his life.

We cannot say that the verdict is so large as to shock the judicial conscience. Accordingly, the verdict will stand and defendant's request for a remittitur is denied.

## V

■■ The jury also returned a verdict against the plaintiff and in favor of the codefendant, Dr. Nasralla. In his separate appeal, plaintiff argues that the trial court improperly restricted his cross-examination of Dr. Schaeffer, defendant's expert. Specifically, he alleges that barring the plaintiff from asking Dr. Schaeffer what he would do under similar circumstances is an unwarranted intrusion upon plaintiff's right to cross-examine. Plaintiff seeks a new trial against Dr. Nasralla.

In his discovery deposition, Dr. Schaeffer testified that Dr. Nasralla's failure to see the plaintiff on Saturday did not violate the standard of care. However, he also testified that in his personal medical practice, if faced with similar circumstances, he would see the patient. The trial court granted defendant's motion *in limine* and barred plaintiff's counsel from asking the medical expert at trial what his personal practice would be.

Whether to admit evidence or not is within the sound discretion of the trial court and that decision will not be reversed absent an abuse of discretion. (*First National Bank v. Porter* (1983), 114 Ill. App. 3d 1, 14, 448 N.E.2d 256, *appeal denied* (1983), 96 Ill. 2d 539.) Similarly, the scope of cross-examination of a medical expert rests within the sound discretion of the trial court. *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 407-08, 466 N.E.2d 210.

A plaintiff cannot establish a *prima facie* case of medical malpractice by presenting the testimony of another physician that would have treated the patient differently than did the defendant physician. Medicine is not an exact science. (*Walski v. Tiesenga* (1978), 72 Ill.

2d 249, 261, 381 N.E.2d 279.) An expert's statement as to what he would have done in the situation encountered by the defendant doctors is irrelevant since the issue at trial is whether the defendant acted contrary to the standard of care. (*Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 835, 390 N.E.2d 53, *appeal denied* (1979), 79 Ill. 2d 618.) Accordingly, the limitation of the scope of cross-examination placed on plaintiff's counsel was not an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Cook County entered against defendant Dr. Klompien and for plaintiff is affirmed; and the judgment for defendant Dr. Nasralla and against plaintiff is affirmed.

Affirmed.

STAMOS and SCARIANO, JJ., concur.