MAURICE COLLINS, A Minor, by his Mother and Next Friend, Margaret Collins, Plaintiff-Appellant, v. ROSELAND COMMUNITY HOSPITAL *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—90—0782

Opinion filed September 17, 1991.

---

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring, William J. Jovan, and Leslie J. Rosen, of counsel), for appellant.

Winston & Strawn, of Chicago (Neil E. Holmen, Timothy J. Rooney, and Danae K. Prousis, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Maurice Collins brought suit against defendants S.S. Pongched, M.D., Bernard Cantorna, M.D., Edmund Ringus, M.D., Roseland Community Hospital (Roseland), Lawrence Lilien, M.D., and County of Cook (Cook County) for injuries allegedly sustained due to the several defendants' negligence during his birth. A jury returned a verdict of $3.5 million against Dr. Cantorna and Dr. Ringus, and found the remaining defendants not liable. Plaintiff appeals the jury's verdict in favor of Roseland, Dr. Lilien, and Cook County (jointly defendants), contending that (1) the circuit court erred in allowing certain of Dr. Lilien's testimony; (2) a defense expert's testimony should not have been admitted; (3) the verdict in favor of Dr. Lilien, Cook County, and Roseland was inconsistent with the verdict against Dr. Cantorna; (4) the verdict in favor of Dr. Lilien, Cook County, and Roseland was against the manifest weight of the evidence; (5) certain medical expenses of plaintiff were erroneously barred; and (6) the damage award was palpably inadequate and reflected jury passion and prejudice.

At approximately 9:30 p.m. on July 8, 1977, when Margaret Collins was admitted to Roseland, she was in the early stages of labor; her bag of water was intact; and her cervix was dilated two centimeters. At approximately 11 p.m., the nurses at Roseland routinely connected her to an external fetal monitor, which charts the infant's heartbeat and the uterine contractions of the mother. At 2:20 a.m. the next day, the fetal monitor was disconnected.

In 1977, the hospital standard of care was to monitor fetal heart beats every 30 minutes in the first stage of labor either manually by fetoscope or electronically. Collins' medical chart contained normal fetal heart tone readings at 2:20 a.m. and 5:50 a.m. The practice at Roseland was not to chart every heart tone taken unless there was an abnormality.

At 6:05 a.m. on July 9, 1977, Collins gave birth to plaintiff. The delivery, performed by Dr. Pongched, the obstetrician on staff at Roseland, was a normal, vaginal delivery; however, at birth, plaintiff's head and face were covered with meconium.[1]

After plaintiff's head emerged, Dr. Pongched wiped plaintiff's face, nose, and mouth with gauze; he then used a ball syringe to suck mucous from plaintiff's nose and mouth; lastly, he used a DeLee suction catheter to go deeper inside plaintiff's throat to remove as much of the meconium amniotic fluid as possible. After plaintiff fully emerged from the uterus, Dr. Pongched used a laryngoscope to see deeper inside his throat and used an endotracheal tube to go beyond his vocal cords. He continued using the DeLee suction catheter to empty plaintiff's stomach contents. The procedures performed by Dr. Pongched were necessary to prevent the meconium from entering plaintiff's lungs, which otherwise could obstruct air and become caustic if inhaled.

After the delivery, Dr. Pongched found plaintiff to be in satisfactory condition; however, he asked Mary Doles, the nurse assisting the delivery, to contact a pediatrician because plaintiff might have aspirated some meconium. As a routine procedure, Doles entered plaintiff's Apgar scores[2] of 3 at one minute and 6 at five minutes. At both one minute and five minutes, plaintiff received a score of 1 for color, which means that the infant's body is pink but his extremities are blue, a condition known as acrocyanosis.

At 6:20 a.m., when plaintiff was admitted to the nursery, he was in an isolette with oxygen running at 48%, in stable condition; however, Charlene Dugan, the nurse in charge of the nursery at Roseland, noted that plaintiff was "cyanotic,"[3] his cry was weak, and he appeared lethargic. At 7 a.m., Dugan called Dr. Cantorna, a pediatrician on staff at Roseland. Thereafter, at 8 a.m., Dugan charted plaintiff's

---

[1]Meconium is the infant's stool while in the womb. Its presence at birth may indicate that the infant suffered some type of distress prior to delivery.

[2]Apgar scores measure an infant's respiration, color, heart rate, muscle tone, and reflexes. Each of these five categories is scored either 0, 1, or 2, 0 being the worst and 2 being the best. The total scores of each of the five categories are then added to reflect the total Apgar score, 10 being the best score.

[3]There are two types of cyanosis; the first is central cyanosis, meaning the infant's entire body is blue, and the second is acrocyanosis, meaning only the extremities are blue. Dugan testified that she used the term "cyanotic" to denote acrocyanosis, which requires no extraordinary treatment and is not a serious condition.

vital signs; his weight was 7 pounds 6 ounces, his temperature was 97.6 degrees, and his respirations were 64.

At 9 a.m., Dr. Cantorna examined plaintiff in the nursery and concluded that he was in a somewhat depressed condition; his heart rate was normal, his respirations were slightly high, and he had slight cyanosis. Dr. Cantorna ordered a chest X ray, the result of which was communicated to him over the phone by Dugan at 10:15 a.m. The X-ray report prepared by Dr. Ringus, a radiologist, recorded: "The heart is of normal size. There are patchy infiltrates in the right lower lobe. A bronchogram is also seen in the right lower lobe. There is also a thickening of bronchovascular markings in the left lobe. The findings are consistent with either neonatal atelectasis or aspiration pneumonia." Dr. Ringus failed to detect and diagnose a pneumothorax, or rupture in plaintiff's lungs, which causes air to escape and may collapse the lungs. A pneumothorax was later identified in the X ray.

In addition to reading the X-ray report to him, Dugan told Dr. Cantorna that plaintiff was on 50% oxygen and was having some respiratory difficulty, but that his condition basically had not changed. Dr. Cantorna gave no further orders to the nurses nor did he examine plaintiff again. Dugan wrote in plaintiff's chart that he was "having respiratory difficulty. Oxygen turned up to 50 percent concentration." At 10:30 a.m., plaintiff's chart reflected that his color appeared "cyanotic" and he was "gasping and having grunting respirations." At 11:10 a.m., Dugan noted that plaintiff's pulse was 168, his respirations were 100, and he was having slight retractions, meaning that his chest was heaving slightly.

At 11:45 a.m., Dugan called Dr. Cantorna and advised him that plaintiff's respirations had increased; Dr. Cantorna then ordered plaintiff's transfer to Cook County Hospital (County) because Roseland did not have the equipment required for intensive care. At 11:50 a.m., Dugan called County, reporting that plaintiff was cyanotic, grunting, and lethargic, and had a weak cry. Dugan's last note on plaintiff, at 1:40 p.m., stated that plaintiff was in "apparently poor condition" and that he was cyanotic and lethargic.

At 1:10 p.m., County's transport team, headed by Dr. Lilien, arrived at Roseland. Dr. Lilien examined plaintiff there to see if he was centrally pink; he also checked plaintiff's temperature and examined his lungs and heart. Dr. Lilien also viewed plaintiff's chest X ray taken earlier that morning and noticed that it showed a pneumothorax; he did not order an additional X ray, but rather relied on plaintiff's color, which was centrally pink. Although Dr. Lilien diagnosed a pneumothorax from plaintiff's X ray, no additional treat-

ment was required while his color remained centrally pink. Dr. Lilien placed him in a transport isolette, showed him to his mother, and explained his condition to her. At 1:40 p.m., County's transport team left Roseland with plaintiff.

At 2:20 p.m., plaintiff arrived at County's Neonatal Intensive Care Unit. Upon his arrival, plaintiff was receiving 60% oxygen, was experiencing moderate respiratory distress, and had a small pneumothorax. Soon thereafter, plaintiff's condition worsened; his pneumothorax increased, his color became worse, turning centrally blue, and his left chest started to bulge with a tension pneumothorax.[4] As treatment, Dr. Lilien "needled" plaintiff's chest to drain the air from the left side in order to relieve the tension pneumothorax. After plaintiff's condition did not improve, Dr. Lilien used an Ambubag to force air into plaintiff's nose and mouth and to expand his lungs; he intubated, or passed a tube into, plaintiff's windpipe; he inserted a chest tube; and he placed a nasogastric tube in plaintiff's nose and stomach. Plaintiff also was placed on a ventilator; however, he still appeared blue and he developed pulmonary hypertension. By 11 p.m., plaintiff had suffered seizures and had become bluer. By 3 a.m. on July 10, 1977, plaintiff's oxygen level had stabilized.

As a result of his post-birth medical problems, plaintiff was diagnosed as having developmental delay secondary to birth anoxia, or inadequate oxygen supply. He suffers from severe physical and mental handicaps; at age 11, he was first learning to read and he could move about only by scooting on his hands and knees.

On July 31, 1979, plaintiff first filed his complaint against the several defendant doctors and hospitals. At trial, he called several expert witnesses who testified that defendants deviated from the medical standard of care. Dr. Robert Brouilette, plaintiff's neonatology expert, testified that Dr. Lilien deviated from the standard of care in transporting plaintiff to County without first taking an X ray or other pretransfer steps to determine the extent of plaintiff's pneumothorax. Nurse Constance Dennis and Robert Matview, M.D., testified for plaintiff that Roseland's nurses deviated from their standard of care in not monitoring Collins prior to plaintiff's birth and in failing to monitor plaintiff's condition. Defendants offered countervailing expert testimony.

---

[4] A tension pneumothorax is an accumulation of air between the lungs and the chest wall of such volume that the pressure inside the heart increases. This pressure causes the lung on the one side to collapse; moves the heart to the other side; and, if great enough, interferes with the function of the other lung.

On February 8, 1989, the jury returned a verdict of $3.5 million against Dr. Cantorna, the pediatrician at Roseland, and Dr. Ringus, the radiologist at Roseland. The jury found on behalf of Roseland; Cook County; Dr. Pongched, the obstetrician at Roseland; and Dr. Lilien, the head of the transport team from County.

On June 2, 1989, the circuit court approved a post-trial settlement between plaintiff and Dr. Cantorna, Dr. Ringus, and Dr. Pongched in the amount of $2.2 million. On July 20, 1989, the verdict and judgment against Dr. Cantorna and Dr. Ringus was dismissed with prejudice.

Plaintiff appeals only from the verdict in favor of Dr. Lilien, Roseland, and Cook County.

I

Plaintiff initially contends that the circuit court erred in admitting portions of Dr. Lilien's testimony, specifically, his routine habit and practice and his care of plaintiff in violation of an *in limine* order. Moreover, plaintiff asserts, throughout Dr. Lilien's testimony as an adverse witness and on direct examination in his case in chief, he never testified from memory or from refreshed recollection.

In response, Dr. Lilien contends that he properly testified as to his routine and habit and, further, that such evidence was offered into evidence by plaintiff himself during his examination of Dr. Lilien as an adverse witness and was not in violation of the *in limine* order. Dr. Lilien additionally maintains that he did indeed testify from memory and from refreshed recollection.

Plaintiff points to numerous instances in the record which, he alleges, indicate that Dr. Lilien's memory was not refreshed. Dr. Lilien's answer to the question of whether he had "any independent recollection of" plaintiff's treatment was "I know what I did for [plaintiff], but I can't independently recollect what happened 12 years ago." Again, after being asked as an adverse witness whether "the chart does not, again, refresh your independent recollection," Dr. Lilien responded, "That's correct." While on direct examination in his case in chief, Dr. Lilien was asked whether he had an opinion as to what he did for plaintiff based upon a review of his records; Dr. Lilien's response was "I know what I did." After being asked, "[D]o the records refresh your recollection as to what you did for [plaintiff]," Dr. Lilien responded that "It tells me what I did. I could tell you what I did based on the records." Dr. Lilien's response was not accepted by plaintiff's counsel, who continued to object on the basis that Dr. Lilien's memory was not refreshed. When asked by the court

whether the records refreshed his recollection, Dr. Lilien responded that "I don't understand all this legal stuff. I could tell you that I know what I did." Finally, after being asked again whether a review of the records refreshed his recollection, Dr. Lilien answered, "I could tell you what I did. If that's a recollection then I guess it does." After these several attempts to elicit the language that his "recollection was refreshed," the court accepted Dr. Lilien's testimony.

■ Plaintiff maintains that the above instances prove that Dr. Lilien's recollection was not refreshed. He argues that Dr. Lilien "dodged the question" and the court became "confused." It is apparent that both the attorneys and the court had some difficulty getting Dr. Lilien to say the precise words; however, the gist of Dr. Lilien's circuitous responses was that he could tell what he had done for plaintiff after looking at the records. Clearly, the court, in its discretion (see *People v. Ryan* (1984), 129 Ill. App. 3d 915, 917, 473 N.E.2d 461), properly held that his recollection was refreshed.

■ Plaintiff also contends that Dr. Lilien's testimony as to his habit and routine was improperly admitted; however, testimony concerning his routine and customary practice was first elicited by plaintiff while Dr. Lilien was an adverse witness. Evidence of routine or habit is admissible to prove that the conduct of the person was in conformity with habit or routine practice. (*Wasleff v. Dever* (1990), 194 Ill. App. 3d 147, 154-55, 550 N.E.2d 1132; *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 859, 508 N.E.2d 508.) "[H]abit testimony is relevant and the only limitations imposed on its admission have been on the basis of necessity." (*Bradfield v. Illinois Central Gulf R.R. Co.* (1987), 115 Ill. 2d 471, 475-76, 505 N.E.2d 331.) Plaintiff himself initially introduced the evidence of which he complains and, thus, cannot now allege error. *Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 23, 404 N.E.2d 823; see *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 949, 408 N.E.2d 970.

■ In addition to the previously discussed alleged errors in the admission of Dr. Lilien's testimony, plaintiff contends that Dr. Lilien violated the court's *in limine* order prohibiting him from testifying that since he had shown plaintiff to his mother, plaintiff must have been pink, because his practice was not to show centrally blue infants to their mothers. Although plaintiff urges this court to find prejudicial error, he has not offered any instances which would show that Dr. Lilien violated the order.

Plaintiff points to several portions of the record, none of which show that Dr. Lilien violated the *in limine* order. All those portions do show is that while being examined as an adverse witness, Dr. Li-

lien testified that he made sure an infant was warm and pink before transfer and he would check an infant's tongue to see if it was centrally pink.

In order to be entitled to a new trial based on errors in the admission of evidence, the party alleging the errors must demonstrate that the circuit court abused its discretion and the evidence resulted in prejudice. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 476 N.E.2d 1232.) Here, plaintiff has failed to point to any evidence which was introduced erroneously or which prejudiced his trial; he cannot complain of errors he himself committed, invited, or induced. *In re Estate of Bania* (1984), 130 Ill. App. 3d 36, 39, 473 N.E.2d 489.

## II

Plaintiff next urges that the circuit court erred in allowing the testimony of Dr. Carl Hunt, Dr. Lilien's expert witness, because it was improperly based upon his own personal habit and routine and how he would have acted in similar circumstances. Plaintiff further argues that Dr. Hunt's testimony was improperly based upon Dr. Lilien's testimony. Plaintiff's assertion, however, is a mischaracterization of the record.

■ When asked about the significance of Roseland's records, Dr. Hunt explained that they helped him get a mental image of plaintiff's status during his treatment. Dr. Hunt explained further that, "If the baby were in some kind of acute distress requiring some kind of acute emergency treatment, I as the neonatologist *or any neonatologist* would not take the extra time to go in and talk with the mother, show the baby to the mother and do those kind of steps." (Emphasis added.) Although Dr. Hunt did refer to what he, as a neonatologist, would have done, he specifically stated what "any neonatologist" would have done; however, in his brief, plaintiff omits the italicized portion of Dr. Hunt's testimony and plaintiff's attempt to portray Dr. Hunt's testimony as improper fails. Nothing in the record shows that Dr. Hunt relied on anything but the hospital records. Further, plaintiff's assertion that Dr. Hunt relied on Dr. Lilien's testimony is not borne out by the record.

"[G]reat liberality is allowed the expert in determining the basis of his opinions ***. Whether an opinion should be accepted is not for the trial judge. That is for the finder of fact." (*Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 216, 503 N.E.2d 355, citing *Mannino v. International Manufacturing Co.* (6th Cir. 1981), 650 F.2d 846, 853.) Expert opinions based upon the records of other doctors and hospitals are proper. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 194,

417 N.E.2d 1322.) The admission of evidence rests within the sound discretion of the circuit court and will not be reversed absent an abuse of that discretion (*Swaw v. Klompien* (1988), 168 Ill. App. 3d 705, 715, 522 N.E.2d 1267). We find that the circuit court did not err in admitting Dr. Hunt's testimony.

## III

Plaintiff next asserts that defendants' verdict was inconsistent with the verdict against Dr. Cantorna. Specifically, plaintiff maintains, in returning a verdict against Dr. Cantorna, the jury had to determine that plaintiff's condition at Roseland was not stable; similarly, in reaching a verdict in favor of defendants, the jury must have determined that plaintiff's condition was stable while he was at Roseland. Thus, plaintiff asserts, the verdicts are inconsistent.

Defendants maintain that different theories of liability were advanced against each of the separate defendants and different standards of care were applied to each defendant. Thus, while the jury found Dr. Cantorna negligent, it did not find that Dr. Lilien, Roseland, or Cook County had violated their respective standards of care. Further, defendants argue that because the jury found one defendant liable while finding the others not liable does not mean that the jury's verdict was inconsistent. Rather, defendants contend, the jury simply found that plaintiff had not met his burden of proof against Dr. Lilien, Roseland, and Cook County.

■ Where verdicts which are legally inconsistent are returned in the same action, they must be set aside and a new trial granted. (*Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 316, 472 N.E.2d 411; *Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 1046, 495 N.E.2d 141; *Kimmel v. Hefner* (1962), 36 Ill. App. 2d 137, 183 N.E.2d 13.) Unlike the cases cited by plaintiff, we find that the verdicts in the instant case are not inconsistent. The evidence adduced at trial here established that plaintiff was cared for by a number of different health professionals during his treatment at Roseland and at County, requiring differing degrees of care and subject to differing standards of care. After hearing the testimony of numerous witnesses and experts at trial, the jury chose to find one of the defendant doctors, Dr. Cantorna, liable for plaintiff's injuries. As plaintiff himself argues, the jury's verdict against Dr. Cantorna "could only have been for his failing to return to the nursery and treat [plaintiff] or to have him transferred." Simply because the jury found Dr. Cantorna liable does not mean that all other doctors and nurses who treated plaintiff were also liable.

Nor does a finding against Dr. Cantorna mean that plaintiff's condition while at Roseland's nursery was not stable. Both Nurse Dugan and Dr. Lilien testified that plaintiff's condition while at Roseland was stable and that he was centrally pink. Further, plaintiff's expert witness, Dr. Brouilette, admitted that even if plaintiff had been stable and centrally pink in Roseland's nursery (a fact upon which defendants rely), Dr. Cantorna should have transferred plaintiff to a tertiary care center where blood gas tests could have been taken and where plaintiff could have been monitored by a neonatology team skilled at handling respiratory problems. The evidence presented at trial showed that plaintiff was centrally pink while at Roseland and when he arrived at County. Testimony established that if plaintiff was centrally blue, he needed more treatment than was given; however, if plaintiff was centrally pink, he needed no additional treatment than was given by Dr. Lilien, Roseland, and County.

The jury, after weighing the large volume of evidence presented from witnesses and experts, found that Dr. Cantorna's negligence proximately caused plaintiff's injuries. The jury, supported by the evidence at trial, further found that Dr. Lilien, Roseland, and Cook County were not liable. Both findings are consistent with the evidence at trial; consequently, we find that the verdicts are not inconsistent.

## IV

Plaintiff next asserts that the jury's verdict was against the manifest weight of the evidence. Specifically, plaintiff maintains that the evidence adduced at trial established that Dr. Lilien was negligent in failing to order additional X rays after diagnosing a pneumothorax and that Roseland's nurses were negligent in failing to properly treat plaintiff's respiratory problems. Plaintiff thus argues that the verdict in favor of Dr. Lilien, Roseland, and Cook County was unwarranted by the evidence presented at trial.

A jury verdict is contrary to the manifest weight of the evidence only if wholly unwarranted by the evidence; a verdict should not be set aside, however, merely because the jury could have drawn different inferences and conclusions from conflicting testimony. (*Poulakis v. Taylor Rental Center, Inc.* (1991), 209 Ill. App. 3d 378, 384, 568 N.E.2d 196; *Thiele v. Ortiz* (1988), 165 Ill. App. 3d 983, 996, 520 N.E.2d 881.) A verdict is deemed to be against the manifest weight of the evidence when "an opposite conclusion is clearly apparent or when the finding of the jury appears arbitrary and unsubstantiated by the evidence." *United States Department of Housing & Urban Development v. Anderson* (1988), 178 Ill. App. 3d 752, 754, 533 N.E.2d 919.

In the instant case, there was evidence at trial which could have supported both plaintiff's and defendants' positions. Both parties presented the testimony of qualified expert witnesses. Here, as in most malpractice cases, where the parties offer conflicting medical testimony regarding the applicable standard of care, the jury is uniquely qualified to resolve the conflicts. (See *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 666, 510 N.E.2d 1066.) We will not substitute our judgment for that of the jury where, as here, no clear indication exists that the jury's verdict was arbitrary or unsubstantiated by the evidence. The jury's verdict, supported by the testimony of witnesses and experts at trial, was not against the manifest weight of the evidence.

Because of our disposition of the issues we have addressed, we need not address the last two issues raised by plaintiff, both of which relate to alleged errors concerning damages.

Based on the foregoing analysis, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.