ANN HULMAN, Plaintiff-Appellant, v. EVANSTON HOSPITAL CORPORA-
TION, d/b/a Evanston Hospital, Defendant-Appellee.

First District (5th Division)   No. 1—91—3257

Opinion filed March 11, 1994.

William J. Harte, of Chicago (Joan M. Mannix, of counsel), for appellant.

John J. Walsh III, Robert Marc Chemers, and Scott O. Reed, all of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

## NATURE OF THE CASE

Plaintiff, Ann Hulman, sought to recover damages for bodily injury sustained as a result of the alleged negligence of a hospital employee. Following a jury trial in the circuit court of Cook County, a verdict was returned in favor of defendant, Evanston Hospital. Plaintiff brings this appeal from the judgment entered upon that verdict.

## FACTS

On March 26, 1984, plaintiff, Ann Hulman, was brought to Glen-

brook Hospital by paramedics. There, she was diagnosed as having suffered upper gastrointestinal bleeding leading to a drop in blood pressure and a stroke on the right side of her brain. Plaintiff also had a fractured hip as a result of a fall at the time of the stroke. While at Glenbrook Hospital, her condition improved and her treating physician, Dr. Justina Tanhehco, determined plaintiff was a candidate for an inpatient rehabilitation program in defendant, Evanston Hospital. Plaintiff was transferred to Evanston Hospital on April 17, 1984, where her condition continued to improve.

On the morning of May 4, a nurse assisted plaintiff from her hospital bed to the toilet. Plaintiff requested privacy. The nurse left the room while plaintiff was sitting on the toilet. Plaintiff testified that she called for a nurse, but there was no response, so after sitting there for what "seemed like hours" she attempted to lift herself from the toilet. As she did so, she fell, fracturing the femur bone of her left leg. The leg was casted later that day. In the weeks that followed, plaintiff suffered a series of seizures, a heart attack, and gangrene. Eventually, both legs were amputated.

On June 7, 1985, plaintiff filed suit in the circuit court of Cook County for damages against defendant Evanston Hospital. The amended complaint alleges that the nurse, acting within the scope of her employment for defendant, was negligent in abandoning plaintiff after assisting her onto the toilet and that this negligence was a direct and proximate cause of plaintiff's fall and injuries.

Prior to trial, defendant brought a motion *in limine* to exclude testimony regarding defendant's alleged lack of sufficient effort to identify and locate the nurse who left plaintiff unattended. The trial judge granted defendant's motion. He ruled, however, that plaintiff's counsel could comment that defendant had not disclosed the attending nurse's identity and defense counsel could comment that the hospital did not know the identity of the nurse.

At trial, Dr. Justina Tanhehco, M.D., testified for plaintiff. Dr. Tanhehco, board certified in physical medicine and rehabilitation, was plaintiff's attending physician while she was in Evanston Hospital after her stroke. She stated that because of the hip fracture sustained during the stroke, she had not authorized plaintiff to stand alone. She also said that some patients who have had a stroke damaging the right side of the brain are somewhat impulsive and may have perceptual difficulties. Dr. Tanhehco had devised a rehabilitation plan for plaintiff which initially set a goal of moderate assistance in transferring from a bed to a chair, but was revised as plaintiff improved, so that the new goal was to achieve transfers (movement between bed and chair or wheelchair and between

wheelchair and toilet) with minimal (10% to 25%) assistance. Dr. Tanhehco stated that, as of May 3, 1984, the plan had been to discharge plaintiff from the hospital in approximately one week.

According to Dr. Tanhehco, before moving a stroke patient from her bed to the toilet, a nurse is required to do an on-the-spot assessment as to whether such a move (a transfer) should be made. Such an assessment would include consideration of how the patient had previously transferred with that nurse and with other nurses and a judgment as to the patient's ability to stand, whether she was leaning when sitting, and what her mental orientation was at that particular time. Dr. Tanhehco testified that plaintiff had first used the toilet on April 19, 1984, and had improved at that skill thereafter.

Dr. Tanhehco stated that when she saw plaintiff at 8 a.m. on May 4, 1984, her orientation was good, but that a stroke patient's orientation can change. She testified that, on that same morning, she happened to be at the nurses' station near plaintiff's room at the time of the fall shortly before 10 a.m. She went into the room after hearing a noise and found plaintiff on the floor and in pain. She examined plaintiff, noticed increased tenderness in the left hip area, and ordered X rays, which showed a new fracture of the left femur. She stated that she did not know who had left plaintiff alone, nor did she know for how long plaintiff had been left there alone.

On cross-examination, Dr. Tanhehco said that when she saw plaintiff immediately after the fall at approximately 10 a.m., plaintiff's orientation appeared to be the same as it had been at 8 a.m. She saw no reason to believe that plaintiff's orientation would have changed in that two-hour interval. Dr. Tanhehco further stated that although plaintiff claimed to have pushed the call button, she had not noticed any activated call light at the nurses' station.

Over plaintiff's objection, Dr. Tanhehco testified on cross-examination that to a reasonable degree of medical certainty based on her observations two hours before the fall and immediately after the fall, it was "a matter of good nursing judgment" to leave plaintiff alone on the toilet in that condition.

On redirect examination, Dr. Tanhehco was again asked if it was good nursing practice to leave the patient alone on the toilet. She replied, "That's general practice for a short time, yes." She admitted she did not know how long plaintiff had been left alone. Plaintiff's counsel then asked, "Because you don't know that, it is a fact isn't it that it may well not have been good nursing practice in this case on that day to have situated and tended to Mrs. Hulman as was done; isn't that true?" Dr. Tanhehco replied "Yes."

Plaintiff's two daughters, Cecelia Currie and Jennifer Manz, also testified for plaintiff. Prior to Ms. Currie's testimony, defendant moved to bar admission of a pamphlet entitled "Stroke: Why Do They Behave That Way?" and to bar testimony as to its content. The pamphlet, distributed by defendant to plaintiff's daughters and to families of other stroke victims, dealt with general characteristics of stroke victims. Plaintiff sought to introduce the pamphlet to show the hospital's knowledge that patients like plaintiff tend to act impulsively and, therefore, need to be closely watched. The trial judge held the pamphlet to be inadmissible, finding that, because it discussed some characteristics not applicable to the plaintiff, it was not relevant to show the hospital's knowledge of plaintiff's condition and could be confusing to the jury. The judge did rule, however, that plaintiff's family could orally testify about information the hospital gave them as to plaintiff's care and condition.

On direct examination, Ms. Currie testified that hospital personnel had instructed her about home care for her mother. They told her never to leave her mother in an unstable position because she would overestimate her abilities and have trouble with spatial relationships. Hospital nurses had told her a family member should always be present to help with transfers to the bathroom when plaintiff came home. Ms. Currie also testified that the hospital provided her and her sister with a pamphlet and showed a film on characteristics of stroke victims, both indicating that right-sided stroke victims can overestimate abilities and should not be left alone in an unstable position.

On cross-examination, Ms. Currie stated that a hospital social worker had also given the pamphlet and shown the film to families of other stroke victims in the hospital. She testified that, prior to the fall, plaintiff had returned home on a short pass to attend a family party. At that time, hospital personnel had instructed Ms. Currie to lift plaintiff during transfers rather than to attempt the type of transfer used at the hospital, which involved plaintiff pivoting on her unimpaired leg.

Jennifer Manz, another daughter of plaintiff, testified that nurses from the rehabilitation department had taught her how to transfer her mother and that during such instruction her mother was never left alone in a sitting position. She testified that the nurses instructed her never to leave her mother in a chair, an admonition which she said was reiterated in the pamphlet and film shown to her and her sister and families of other stroke victims. Ms. Manz stated that on May 4, when she visited her mother at the hospital, her mother was "in her bed twisted up like a pretzel." She went to the nurse's station

to ask what had happened. She testified, "They said that she fell and I said could I talk to her nurse, I want to know what happened. They said I don't know where she is."

Plaintiff also called Eutilda Kerr, R.N., who, at the time of plaintiff's fall, was a nursing assistant at Evanston Hospital. She stated that, although she was in another patient's room when plaintiff fell, she completed the accident report. She testified that she had been taught to assess a stroke patient's capabilities at the time a patient was to be moved, even if a doctor had seen the patient a couple of hours earlier, as the patient's condition could have changed in the interim. She also stated she had been taught to keep watch while a patient was on the toilet.

Plaintiff's expert witness was Carol Berding, R.N., who served as director of nursing for medical surgical units at St. Francis Hospital in Evanston. She testified that right-sided stroke victims experience weakness of the left side of their bodies, perceptual difficulties, and overestimation of their abilities. She testified that because of the stroke and the hip fracture, plaintiff was at high risk of falling. She further stated that a stroke patient should never be left alone on the toilet and that the nursing standard of care for assisting a stroke patient to the bathroom is no different in a rehabilitation unit than elsewhere in a hospital. She testified that, to a reasonable degree of medical certainty, the standard of care was violated by leaving plaintiff unattended on the toilet. She found the existence of a call button to be irrelevant because plaintiff could mistakenly think she had called the nurse.

On cross-examination, Ms. Berding admitted she had never been part of a rehabilitation team and was not familiar with any publications on rehabilitation nursing. Although the hospital records did not note that plaintiff was at a high risk for a fall, Ms. Berding stated that a right-sided stroke victim would always be at such high risk.

Plaintiff testified via a videotaped evidence deposition that, prior to her fall, she had learned how to transfer herself to a wheelchair, but she was not supposed to do so. On the morning of the fall, a nurse helped her to the toilet. At plaintiff's request, the nurse left her alone to permit her some privacy, telling her she did not have a "bell" for her to use, but she would hear plaintiff if she called out to her. Plaintiff testified she had called for the nurse, but there was no response. She stated, "And I sat there for I don't know how long. It seemed like hours. And I decided I couldn't stand it anymore, and since I knew how to do it, I would get up and get into the chair by myself." She then grabbed the railing on the sink and pulled herself

onto one leg. Just then, there was a loud scream from her roommate, whom she could see because the bathroom door was ajar. Plaintiff, frightened by the scream, let go of the railing and fell. Dr. Tanhehco and several nurses came, but the nurse who had abandoned her was not among them, nor did she know that nurse's name.

On cross-examination, plaintiff testified that up to the day of her fall she would use the call button to call a nurse whenever she wanted to use the toilet. A nurse would take her to the bathroom, help her onto the toilet and leave her there so she could have time to herself.

Defendant called Rhonda Greenspan, a certified rehabilitation registered nurse, as its expert. She testified that, while orthopedic nursing focuses on satisfying direct medical needs of a patient, any acute care medical problems are generally under control by the time a patient comes to a rehabilitation facility. Therefore, in rehabilitation, the nursing focus is on teaching patients to care for themselves and to attain their optimal level of functioning. Over plaintiff's objection, Ms. Greenspan was allowed to testify to the standard of care governing nurses in a rehabilitation unit. She stated that the transfer techniques used in a rehabilitation unit by nurses and therapists, unlike those in orthopedic settings, build on levels of independence and that the promotion of privacy during use of the toilet is an important goal.

Ms. Greenspan testified that one of the standards of care governing nurses in a rehabilitation unit is:

"[T]he nurse does a thorough assessment before implementing any intervention, and then her interventions are based on team input from the interdisciplinary team which is the physical therapist, the occupational therapist, the speech therapist and so on. Once they do an intervention, they do an assessment on that and then they reach a goal. *** [O]nce they reach one phase, it could be a very small phase and a very small goal, they build on the next ones. For example, if she mastered the bedpan *** she could move to the commode. That would be the next phase. If she sat on the commode, exhibited safety aware [sic], good judgment and was able to sit on the commode, then that's the next phase and then it would build on to the next step."

Ms. Greenspan, having testified that she read plaintiff's chart and the testimony of Ms. Berding and Dr. Tanhehco, was allowed to opine, over plaintiff's objection, that leaving plaintiff alone on the toilet on May 4, 1984, was not a deviation from the standard of care. She said that plaintiff had used the toilet several times before and, having apparently mastered that skill, it was "time to move to the next progression up." She also testified that, according to plaintiff's re-

cords, she was not at high risk for falling because she had mastered transfers, she had shown no cognitive behavior to indicate she would not sit still, and there was no indication that she had problems with overestimation of abilities or spatial perception. Ms. Greenspan further opined that there was no outside time limit for leaving plaintiff alone, as there was a call button which plaintiff knew how to operate.

On cross-examination, Ms. Greenspan admitted that during an earlier deposition she had stated that leaving a stroke victim in such a position for more than two or three minutes could be a deviation from the standard of care. She agreed with Dr. Tanhehco's statement that a stroke patient who is well oriented and presenting properly may not be so two hours later, but, in reaching her opinion that there was no deviation from the standard of care, she relied on the doctor's testimony as to plaintiff's orientation immediately after the fall. Ms. Greenspan stated that it would have been permissible to leave plaintiff, even for as long as an hour and a half, because there was a call button.

On redirect, Ms. Greenspan testified that, based on plaintiff's chart and Dr. Tanhehco's testimony, she saw no reason to believe that plaintiff's orientation would have changed between 8 a.m. and the time of the fall. She said that it was not necessary to know whether the nurse actually made an assessment at the time she transferred plaintiff to the toilet because, under the rehabilitation standards, an assessment is made at the point before the next goal is set and the patient progresses to the next level. She stated, "Because Mrs. Hulman had been on the toilet several times before that she already reached that level and mastered that skill." She then stated that plaintiff would not have been a candidate for use of the toilet if she was unable to sit erect, balance, understand directions, and use the call button.

On re-cross-examination, Ms. Greenspan indicated that she agreed with Dr. Tanhehco's testimony that, because it was not known how long plaintiff was left alone, the nurse's actions may not have been good nursing practice. However, at the same time, she also agreed with Dr. Tanhehco's testimony that, based on plaintiff's orientation at 8 a.m. on May 4, 1984, and immediately after the fall approximately two hours later, to a reasonable degree of medical certainty it was a matter of good nursing judgment to leave plaintiff unattended on the toilet.

At the conclusion of the trial, over defendant's objection, the trial court included in its instructions to the jury Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989), which provides:

"If a party to this case has failed to produce a witness within

his power to produce, you may infer that the testimony of the witness would be adverse to that party if you believe each of the following elements:

1. The witness was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The witness was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have produced the witness if he believed the testimony would be favorable to him.

4. No reasonable excuse for the failure has been shown." (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989) (hereinafter IPI Civil 3d No. 5.01).)

The jury returned a verdict in favor of defendant.

On appeal, plaintiff seeks a new trial, contending that the trial court erred (1) by admitting evidence of a standard of care for rehabilitation nursing; (2) by allowing Ms. Greenspan and Dr. Tanhehco to testify there was no deviation from the standard of care; (3) by refusing to allow plaintiff to introduce evidence regarding defendant's failure to disclose the identity of the nurse; and (4) by excluding from evidence the pamphlet given to plaintiff's daughters. In addition, plaintiff contends that the jury's verdict was against the manifest weight of the evidence.

OPINION

We first consider whether the trial court erred in allowing defendant's expert witness, Ms. Greenspan, to testify regarding the standard of care governing nurses in a rehabilitation unit. This standard was in conflict with the general nursing standard of care testified to by plaintiff's expert, Carol Berding, R.N. Plaintiff claims that Ms. Greenspan's testimony was inadmissible because it lacked the necessary factual foundation, *i.e.*, there was no evidence in the record to indicate that the person who left plaintiff unattended (the missing nurse) was, in fact, a rehabilitation nurse or, for that matter, that she was a nurse of any kind. Plaintiff further contends that allowing Ms. Greenspan to testify to a standard of care applicable only to a rehabilitation nurse permitted defendant to benefit from its failure to disclose the missing nurse's identity and to simply assume that she was a certified rehabilitation nurse.

The decision to allow or exclude the testimony of an expert witness is within the sound discretion of the trial court and will not be disturbed on review absent an abuse of that discretion. *Collins v. Roseland Community Hospital* (1991), 219 Ill. App. 3d 766, 774, 579 N.E.2d 1105; *Huelsmann v. Berkowitz* (1991), 210 Ill. App. 3d 806,

810, 568 N.E.2d 1373; *Swaw v. Klompien* (1988), 168 Ill. App. 3d 705, 717, 522 N.E.2d 1267.

■ Plaintiff correctly states that the opinion of an expert is admissible only if it is supported by facts in evidence. (See *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 1064, 458 N.E.2d 1072 (expert's opinion based on presumed facts not in evidence is improper because it may cause the jury to assume that such facts are true and have been adopted by the witness).) However, we disagree with plaintiff's contention that the admissibility of Ms. Greenspan's testimony is dependent on evidence that the missing nurse was a certified rehabilitation nurse. Our review of the record leads us to conclude that Ms. Greenspan did, in fact, testify to the nursing standard of care applicable in a rehabilitation unit, rather than to a standard of care required only of rehabilitation nurses. She referred to "rehab standards" and to rehabilitation transfer techniques used in physical therapy and occupational therapy as well as nursing. She spoke of treatment goals in the "rehabilitative setting," and testified that any intervention by a nurse in a rehabilitation unit is based on input from an interdisciplinary team which includes a physical therapist, an occupational therapist, a speech therapist, and others. Defendant's counsel asked Ms. Greenspan to state the "nursing standard of care that applied to the treatment of Ann Hulman and the assistance of Ann Hulman to the toilet on May 4th, 1984," the "standard that would apply based on [Ann Hulman's] progress in the rehab unit." We also note that in overruling plaintiff's objection to Ms. Greenspan's testimony, the trial judge stated, "She can testify to what the standard of care for a nurse on a rehab unit should be." Thus, it appears that the standard of care to which Ms. Greenspan testified was a standard dependent not upon the nurse's certification, but upon the rehabilitative function of the unit in which plaintiff was placed.

Although the testimony of Ms. Greenspan conflicted with Ms. Berding's as to the applicable standard of care, Ms. Greenspan's testimony had a sufficient factual basis, since it was established that plaintiff was in a rehabilitation unit for the purpose of rehabilitation after her stroke. See *Collins*, 219 Ill. App. 3d at 776 (where competing standards of care are offered, it is within the province of the jury to resolve the conflict). See also *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 666, 510 N.E.2d 1066; *Waterford v. Halloway* (1986), 142 Ill. App. 3d 668, 674-75, 491 N.E.2d 1199 (where experts differ as to applicable standard of care, weight to be assigned expert testimony is question for the jury).

Plaintiff next contends that the testimony of Ms. Greenspan that

there was no deviation from the hospital's standard of care was inadmissible because the opinion was predicated on two assumptions of facts not in evidence: (1) that the missing nurse actually made an assessment of plaintiff's condition before leaving plaintiff alone, and (2) that plaintiff was left for only a short time. Similarly, plaintiff makes the same contention with regard to Dr. Tanhehco's testimony, elicited by defendant on cross-examination, that the nurse's conduct in leaving plaintiff alone was a matter of good nursing judgment.

■ We disagree with plaintiff's contention concerning the first alleged assumption. It is correct that Ms. Greenspan testified on direct examination that one of the rehabilitation standards of care was for a nurse to assess a patient's capabilities before an intervention. However, she then testified on redirect examination that it was not necessary to know whether a nurse actually made an assessment at the time this patient was left alone in the bathroom. Thus, Ms. Greenspan's opinion that there was no deviation from the standard of care was premised not on the assumption that an on-the-spot assessment was performed, but on the fact that, as Dr. Tanhehco had testified, plaintiff had used the toilet previously and had mastered that skill so that it was proper to leave her. She noted that plaintiff would not have been a candidate for use of the toilet if she had been unable to sit erect and balanced, understand directions, and use the call button. Thus, the fact that there was no testimony that the missing nurse made an assessment would not in and of itself vitiate Ms. Greenspan's opinion testimony.

As for Dr. Tanhehco's testimony, it is correct to state that on direct examination she testified that a nurse must make an on- the-spot assessment before moving a patient. However, just as Ms. Greenspan had modified her original statement regarding an assessment, Dr. Tanhehco's cross-examination testimony modified her direct testimony in that same respect, so that it was unnecessary to know whether the missing nurse had, in fact, made an on-the-spot assessment. It was plaintiff who elicited Dr. Tanhehco's testimony on direct examination that the standard of care required a nurse's assessment. It was, therefore, permissible cross-examination for defendant to elicit Dr. Tanhehco's testimony modifying that standard to indicate that a nurse's on-the-spot assessment was not required. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 245, 529 N.E.2d 525 (party may properly cross-examine witness about matters which explain, modify or discredit his or her testimony on direct examination); see also *Piano*, 157 Ill. App. 3d at 672.) The weight to be given Dr. Tanhehco's opinion in light of her earlier testimony was for the jury to determine. See *Sparling v. Peabody*

*Coal Co.* (1974), 59 Ill. 2d 491, 498-99, 322 N.E.2d 5. See generally *Fuery v. Rego Co.* (1979), 71 Ill. App. 3d 739, 745, 390 N.E.2d 97 ("relative weight and sufficiency of expert and opinion testimony in a given case is peculiarly within the province of the trier of fact to decide").

As to plaintiff's contention that the opinions of Ms. Greenspan and Dr. Tanhehco were based on an assumption that plaintiff was left unattended for only a short time, we note initially that this issue has been waived. At trial plaintiff specifically objected to the opinion of Ms. Greenspan, as well as that of Dr. Tanhehco during her cross-examination, based on the absence of evidence of an on-the-spot assessment and on the absence of evidence as to plaintiff's condition at the time of the fall. No objection was made that either opinion was premised on a time period not in evidence.

"It is clear that a specific objection to evidence is a waiver of all points not specified. [Citation.] The purpose of this rule is to inform the trial court of the particular problem and to enable the party offering the testimony an opportunity to confront the objection." (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 87, 392 N.E.2d 628.) A review court is limited to consideration of the grounds presented to the trial court. (See *Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 180, 399 N.E.2d 606; *Gasbarra v. St. James Hospital* (1980), 85 Ill. App. 3d 32, 38, 406 N.E.2d 544.) We also note that plaintiff's post-trial motion does not mention as grounds for error the lack of evidence as to the length of time plaintiff was unattended. A claimed error is waived on review where the post-trial motion does not contain specific allegations as to the basis of the error. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 189-90, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140; see also *Mohler v. Blanchette* (1982), 106 Ill. App. 3d 545, 555, 435 N.E.2d 1161.

■ Furthermore, even if this issue would not have been waived, we conclude that there would have been no error on this basis. As to Ms. Greenspan's opinion, we disagree with plaintiff's contention that her opinion was based on the unsupported assumption that plaintiff had only been left alone for a short time. On direct examination, Ms. Greenspan testified that there was no outside limit for the period of time plaintiff could have been left alone on the toilet. On cross-examination, she reiterated that, because plaintiff knew how to operate the call button, there was no outside time limit and it would have been permissible to leave plaintiff even as long as $1^1/_2$ hours. Although her testimony may have been diluted on re-cross-examination by her acquiescence to Dr. Tanhehco's statement that because the length of time was unknown the nurse may not have

exercised good nursing practice, such dilution was not sufficient to require that her entire testimony on direct examination be stricken. This is particularly true in light of the fact that Ms. Greenspan's acquiescence to Dr. Tanhehco's statement did not purport to be a retraction of her opinion that there had been no deviation from the standard of care. See *Sparling*, 59 Ill. 2d at 498-99 ("contradictory testimony of a witness does not *per se* destroy the credibility of witness or the probative value of his testimony, and it remains for the trier of fact to decide when, if at all, he testified truthfully"); see also *Byrne v. SCM Corp.* (1989), 182 Ill. App. 3d 523, 548, 538 N.E.2d 796 (weight to be accorded expert's testimony which may have been discredited on cross-examination is a jury determination).

As far as Dr. Tanhehco's testimony is concerned, she was plaintiff's witness. As previously noted, she was permitted to testify over plaintiff's objection on cross-examination that there was no deviation from the applicable standard of care. There was no reference in that testimony to any time factor, nor did plaintiff's objection at that time raise any question as to the length of time for which plaintiff may have been left unattended. The significance of the time factor was first elicited in Dr. Tanhehco's rehabilitation testimony on redirect examination. Plaintiff did not then renew her objection to Dr. Tanhehco's opinion on cross-examination, but appeared instead to be satisfied with the posture of the rehabilitation testimony. (See *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 373, 553 N.E.2d 291 (where evidence is admitted subject to later connection and proof of that evidence is never presented, objection must later be renewed to be preserved).) Moreover, even if there would have been error in permitting Dr. Tanhehco's deviation testimony on cross-examination to stand, such error would not have been prejudicial because of plaintiff's effective rehabilitation of Dr. Tanhehco's testimony on redirect. Compare *Swaw*, 168 Ill. App. 3d at 712 (no reversible error where plaintiff elicited opinion through hypothetical question assuming fact not in evidence and defendant revised facts of hypothetical question on cross-examination).

Plaintiff next contends that the trial court erred in granting defendant's motion *in limine* prohibiting plaintiff from introducing evidence that defendant could have discovered, through reasonable diligence, the identity of the missing nurse. Plaintiff contends that the trial court's ruling precluded her from showing that the missing witness was within defendant's power to produce and thus prevented plaintiff from developing and emphasizing the adverse inference permitted under IPI Civil 3d No. 5.01.

■ However, we need not determine whether the trial court erred

in precluding plaintiff from presenting such evidence because, as defendant points out, plaintiff has waived the issue on review by failing to make an offer of proof. An offer of proof is generally required to preserve for review a question as to whether evidence was properly excluded. (*Goad v. Evans* (1989), 191 Ill. App. 3d 283, 298, 547 N.E.2d 690; see also *Forreston County Mutual Fire Insurance Co. v. Fleetwood Homes* (1977), 50 Ill. App. 3d 966, 968, 365 N.E.2d 1364.) "A party cannot complain of the failure to admit evidence without showing what that evidence would be in order to allow the court to assess the prejudice to the complaining party." *Molitor v. Jaimeyfield* (1993), 251 Ill. App. 3d 725, 728, 622 N.E.2d 1250; see also *Piano*, 157 Ill. App. 3d at 668 (party must make the trial court aware of what the expected testimony would be, who would testify, and the purpose of the testimony); *Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 722, 504 N.E.2d 781.

While an offer of proof may not be necessary where the record clearly shows that the trial court already has before it all of the evidence necessary to make an assessment regarding admissibility and possible prejudice from exclusion (*Reuter v. Korb* (1993), 248 Ill. App. 3d 142, 154, 616 N.E.2d 1363), or where the trial court has made it clear that it will not hear an offer of proof (*Goad*, 191 Ill. App. 3d at 298-99), these circumstances do not exist in the present case. There is no indication in the record that plaintiff ever made an offer of proof either after the trial court's ruling on defendant's motion *in limine* or during the course of the trial. The record does not disclose what evidence plaintiff would have presented regarding defendant's efforts, or lack of efforts, to identify the missing nurse. Moreover, the record does not contain the motion *in limine*, nor is there any record of the arguments on the motion. See *Centracchio v. Rossi Construction Co.* (1988), 170 Ill. App. 3d 1007, 1012-13, 542 N.E.2d 1000 (offer of proof at trial which referred to argument on motion *in limine* not sufficient where neither motion *in limine* nor transcript of argument on the motion was included in the record).

Plaintiff's last contention of error by the trial court concerns the trial court's exclusion of a pamphlet entitled, "Stroke: Why Do They Behave That Way?" The record reflects that the pamphlet provides an overview of behavioral characteristics which might be encountered when a stroke victim is released to the care of family members. It provides generalized characteristics and modes of care for left-sided as well as right-sided stroke victims. The record shows that copies of this pamphlet were given to plaintiff's daughters by a hospital social worker. Testimony was also presented that the pamphlet is customarily distributed by hospital personnel to all families of stroke patients.

Although plaintiff specifically disclaimed that she was offering the pamphlet to establish the hospital's standard of care, she urged that the pamphlet's content, coupled with the fact that the pamphlet was given to plaintiff's family, was relevant to show the hospital's knowledge that certain behavioral characteristics of stroke victims included in the pamphlet applied to plaintiff. The trial court denied its admission on the grounds that it was not relevant, stating that it contained information not applicable to plaintiff which could confuse the jury. The trial court did, however, permit plaintiff's family to testify to information regarding plaintiff's behavioral characteristics provided to them by hospital personnel and to freely refer to the contents of the pamphlet as well.

■ A trial court's determination regarding the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. (*Gill v. Foster* (1993), 157 Ill. 2d 304, 313, 626 N.E.2d 190 ("Even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury"); *Collins*, 219 Ill. App. 3d at 774.) In this case, we cannot say that the trial court abused its discretion in excluding the pamphlet. As previously noted, this pamphlet includes information regarding both right-sided and left-sided stroke victims and, in each instance, referring to victims with varying ranges of impairment. Thus, the relevance to plaintiff's specific condition and her required mode of care was tenuous at best. The consequent concern of the trial court about the confusion and possible distortion which the admission of the pamphlet could create or engender was not an abuse of discretion. See *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 360-61, 392 N.E.2d 1 (upholding exclusion of an exhibit because its admission could have been misleading for the jury); accord *Department of Conservation v. Strassheim* (1981), 92 Ill. App. 3d 689, 699, 415 N.E.2d 1346.

Furthermore, plaintiff's daughters were allowed to testify to what information the hospital gave them about their mother's care and condition, and were freely permitted to refer to the pamphlet in that regard. Similarly, the testimony of Dr. Tanhehco and the experts for both parties included statements as to the characteristics of right-sided stroke victims generally, and plaintiff specifically. Consequently, the admission of the pamphlet itself would have been largely cumulative, and its exclusion, even if erroneous, could not be deemed prejudicial. (*Thomas J. Douglas & Co. v. Industrial Comm'n* (1966), 35 Ill. 2d 100, 105, 219 N.E.2d 486 (exclusion of cumulative evidence was harmless error); *Archer Daniels Midland Co. v. Industrial Comm'n* (1988), 174 Ill. App. 3d 918, 926, 529 N.E.2d 237 (since infor-

mation in report would have been cumulative, any possible error in excluding the report would have been harmless). See also *Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 461, 605 N.E.2d 493 (admission of cumulative evidence is within the sound discretion of the trial court).

Lastly, plaintiff contends she should have a new trial because the jury's verdict was against the manifest weight of the evidence. Plaintiff again marshals the evidence presented by Nurses Carol Berding and Eutilda Kerr, supported to some extent by the testimony of Dr. Tanhehco, that the standard of care required that plaintiff should not have been left unattended on the toilet and that the missing nurse deviated from that standard of care. Plaintiff contends that the evidence overwhelmingly supports her position. Also, plaintiff contends that the testimony of defendant's expert witness, Ms. Greenspan, should be disregarded because it was inherently improbable. Specifically, plaintiff claims that Ms. Greenspan's testimony that plaintiff was not at risk of falling, even though she had a broken hip, and that there was no outside time limit for leaving plaintiff alone is incredible and was contradicted by her own testimony and the testimony of other witnesses.

■ Contrary to plaintiff's contention, we do not see Ms. Greenspan's testimony to be inherently incredible. "Under Illinois law, a witness' testimony is inherently improbable if it is 'contradictory of the laws of nature or universal human experience, so as to be incredible and beyond the limits of human belief, or if facts stated by the witness demonstrate the falsity of the testimony.' " (*Bucktown Partners v. Johnson* (1983), 119 Ill. App. 3d 346, 354, 456 N.E.2d 703, quoting *Kelly v. Jones* (1919), 290 Ill. 375, 378, 125 N.E.2d 334, 335.) Here, the hospital records contained no indication that plaintiff was at risk of falling. The evidence also showed that plaintiff had made steady progress in rehabilitation, had used the toilet for approximately two weeks, and was expected to be released from the hospital in about one week. In light of that testimony, we do not believe Ms. Greenspan's statement that plaintiff was not at risk of falling to be beyond belief. Similarly, Ms. Greenspan qualified her statement of no outer time limit by pointing out that plaintiff had previously mastered use of the toilet and knew how to use the call button. The fact that Ms. Greenspan's testimony was contradicted by certain other witnesses and was to some extent diluted by her own testimony on cross-examination, particularly with respect to the outer time limit, goes to the question of her credibility, which is best left for the jury to decide. See *Sparling*, 59 Ill. 2d at 498-99 (credibility of witness whose own testimony is contradictory is for the jury to decide); see

also *Simmons v. University of Chicago Hospitals & Clinics* (1993), 247 Ill. App. 3d 177, 190, 617 N.E.2d 278 (where expert witness' opinions were weakened on cross-examination and contradicted by testimony of other experts, "weight to be afforded such testimony and the credibility to be assigned to the witnesses was for the trier of fact").

"A verdict is said to be against the manifest weight of the evidence where it is palpably erroneous and wholly unwarranted [citation], is clearly the result of passion or prejudice [citation], or appears to be arbitrary, unreasonable, and not based upon the evidence." (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232; see also *Svenson*, 74 Ill. App. 3d at 83.) In applying this standard, the evidence is viewed in the light most favorable to the appellee. *Ford*, 132 Ill. App. 3d at 412; see also *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 444, 511 N.E.2d 798. See *Brooke Inns, Inc. v. S&R Hi-Fi & TV* (1993), 249 Ill. App. 3d 1064, 618 N.E.2d 734, where the court stated:

> "[W]here there is a conflict in the testimony, a reviewing court may not substitute its judgment for that of the jury in passing on the weight of the evidence and on the credibility of the witnesses. [Citation.] A reviewing court may not set aside a verdict merely because the jury could have determined the credibility of the witnesses differently or drawn different inferences of fact." *Brooke Inns, Inc.*, 249 Ill. App. 3d at 1079.

Accord *Collins*, 219 Ill. App. 3d at 776 (verdict is not against manifest weight of evidence "merely because the jury could have drawn different inferences and conclusions from conflicting testimony").

For the reasons already discussed, we cannot conclude that there is no evidence to support the jury's verdict in favor of defendant. The evidence, although conflicting, was sufficient to allow the jury to determine which standard of care applied and that the applicable standard of care was not breached. See *Byrne*, 182 Ill. App. 3d at 545 (reviewing court will not disturb verdict which has evidentiary support in the record).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MURRAY, P.J., and McNULTY, J., concur.